The Steamboat New World, Edward Minturn, William Menzie, and William H. Webb, Claimants and Appellants, *v.* Frederick G. King.

Where a libel was filed, claiming compensation for injuries sustained by a passenger in a steamboat, proceeding from Sacramento to San Francisco, in California, the case is within the admiralty jurisdiction of the courts of the United States.

The circumstance that the passenger was a "steamboat man," and as such carried gratuitously, does not deprive him of the right of redress enjoyed by other passengers. It was the custom to carry such persons free.

The master had power to bind the boat by giving such a free passage.

The principle asserted in 14 How. 486, reaffirmed, namely, that "when carriers undertake to convey persons by the agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence.

The theory and cases examined relative to the three degrees of negligence, namely, slight, ordinary, and gross.

Skill is required for the proper management of the boilers and machinery of a steamboat; and the failure to exert that skill, either because it is not possessed, or from inattention, is gross negligence.

The 13th section of the act of Congress, passed on the 7th of July, 1838, (5 Stat. at Large, 306,) makes the injurious escape of steam *primâ facie* evidence of negligence; and the owners of the boat, in order to escape from responsibility, must prove that there was no negligence.

Steamboat New World et al. *v.* King.

The facts in this case, as disclosed by the evidence, do not disprove negligence. On the contrary they show that the boat in question was one of two rival boats which were " doing their best " to get ahead of each other; that efforts had been made to pass; that the engineer of the boat in question was restless, and constantly watching the hindmost boat; and that the owners of the boat have failed to prove that she carried only the small quantity of steam which they alleged.

THIS was an appeal from the District Court of the United States for the Northern District of California.

It was a libel filed by King, complaining of severe personal injury, disabling him for life, from the explosion of the boiler of the steamboat, New World, while he was a passenger, on her passage from Sacramento to San Francisco, in California.

The District Court decreed for the libellant in twenty-five hundred dollars damages and costs; and the owners of the boat appealed to this court.

The substance of the evidence is stated in the opinion of the court.

It was argued by *Mr. Cutting,* for the appellants, and by *Mr. Mayer,* for the appellee.

Points for the appellants.

*First.* The steamboat New World occupied no relation towards the libellant that imposed on her the duty to carry safely, or any duty whatever, as the libellant had not paid, and was not to pay any compensation for his transportation.

1. The master had no power to impose any obligation upon the steamboat, by receiving a passenger without compensation.

It was not within the scope of his authority. Grant *v.* Norway, 10 Com. Bench R. Mann. G. & S. 664, 688, reported also in 2 E. Law and Eq. R. 337, and 15 Jur. 296; Butler *v.* Basing, 2 C. & P. 613; Citizens Bank *v.* Nantucket, S. B. Co. 2 Story C. C. R. 32, 34; Pope *v.* Nickerson, 3 Story C. C. R. 475; Gen. Int. Ins. Co. *v.* Ruggles, 12 Wheat. 408; Middleton *v.* Fowler et al. 1 Salk. 282.

2. There was no benefit conferred on the steamboat whence any obligation could result.

3. It was not a case of bailment. Story on Bailm. § 2; Kent's Comm. vol. 2, p. 558; Ang. on Car. § 4.

4. The libellant assumed the risk of his own transportation.

5. The libellant stands in a less favorable relation than the steamboat's servants, but she would not be liable to them for negligence of their fellow-servants. Farwell *v.* B. & W. R. R. Co. 4 Metc. 49; Hayes *v.* Western R. R. Co. 3 Cushing, 270; Coon *v.* Syracuse & U. R. R. Co. 1 Seld. 493; S. C. 6 Barb. 231; Priestley *v.* Fowler, 3 M. & W. 1.

6. He stands in a less favorable relation than goods carried under gratuitous bailment of mandate.

For passengers carried for hire stand in less favored positions than goods.

But the gratuitous mandate imposes only the slightest diligence, and attaches liability only to gross negligence. Ang. on Car. § 21; Story on Bailm. §§ 140, 174.

7. He stands in a less favorable relation than slaves transported gratuitously from mere motives of humanity. But the carrier is only liable for gross negligence in their carriage. Boyce v. Anderson, 2 Pet. 156.

8. In no reported case has any such action been brought, or right of action claimed.

*Second.* Even if the libellant were to be regarded as a passenger carried for hire, the steamboat would only be responsible for negligence, and would not be responsible for any injury which should happen by reason of any hidden defect in the absence of negligence. Ingalls v. Bills, 9 Metc. R. 1; Stokes v. Saltonstall, 13 Pet. 181.

But as the libellant was to be carried gratuitously, the steamboat cannot, in any view of the case, be held responsible except for gross negligence. Boyce v. Anderson, 2 Pet. 156; Story on Bailm. § 174.

*Third.* There was no negligence on the part of the steamboat.

1. The boilers were properly constructed. She was built as a first-class boat. She had been inspected by the State Inspector, and allowed 40 pounds of steam; by the U. S. Inspector, and allowed 35 pounds; and by neither of these inspectors was any fault found with the structure of her boilers. Van Wart and Cook both concur in judgment that the boilers were sufficient.

Lightall is the only witness that intimates a different opinion, and he does not testify that it was usual to have a stay-brace, or that it was negligence to omit it. He merely regards it as " a measure of safety," and he then admits, that the " stay," if there, would not have prevented the explosion. It would simply, in his opinion, have made the consequence of the explosion less serious.

2. The boilers were frequently and carefully examined.

No evidence is introduced to controvert this.

3. The engineer employed, and then in charge, was a man of skill and prudence.

This is not denied.

4. The steamboat was not racing.

Mere competition is not of itself negligence, unless recklessly or improperly conducted. Barbour, J., 13 Pet. 192.

5. The steamboat was not carrying an improper amount of

steam. She was allowed 35 pounds by the lowest certificate; 40 pounds by the certificate of another inspector. She was at the time of the accident carrying only 23 pounds.

No witness testifies that she carried more than that.

This is the only fault that could have contributed to the happening of the explosion.

6. Rosin was not used to generate steam.

Haskell is the only witness that gives evidence tending to establish this. But he does not swear the article he saw was rosin. He admits that he did not see any put on the fire. He was stunned by the accident, and his recollection should not be relied on against the positive testimony of two witnesses.

*Mr. Mayer* contended that the decree of the District Court was right for these reasons : —

I. The wrong occurred within the range and "influence" of the tide, and was within the admiralty jurisdiction, as now by this court defined. Waring *v.* Clarke, 5 How. 441; New Jersey Steamboat Co. *v.* Merchants Bank, 6 How. 344.

II. The disaster is of itself *primâ facie* evidence of negligence, culpable to the degree necessary to attach liability for the damage, and there is no testimony here to countervail that conclusion. McKinney *v.* Neil, 1 McLean, 540; Saltonstall *v.* Stokes, 13 Peters, 181.

III. Although the steamboat may not be considered as a "common carrier" in case of a gratuitous service, (or mandate, as the Law of Bailment phrases it,) there is, nevertheless, even under a gratuitous undertaking, an obligation to have all enginery in proper condition to carry passengers safely, and a responsibility proportionate to the scrupulous care necessary in so hazardous a mode of conveyance. And it might be justly contended that a liability attaches here, if even for the slightest negligence. But gross negligence is shown not only by the conduct of the boat on the occasion, but by the incompleteness, for the perils of the passage, of the machinery. That inadequacy, *per se*, imputes gross negligence. McKinney *v.* Neil, 1 McLean, 540; Maury *v.* Talmadge, 2 McLean, 157; Hale *v.* Steamboat Company, 13 Connect. 319; Fellowes *v.* Gordon, 8 B. Monroe, 415; Story on Bailments, 125.

Mr. Justice CURTIS delivered the opinion of the court.

This is an appeal from a decree of the District Court of the United States for the Northern District of California, sitting in admiralty. The libel alleges that the appellee was a passenger on board the steamer on a voyage from Sacramento to San Francisco, in June, 1851, and that, while navigating within the ebb and flow of the tide, a boiler flue was exploded through neg-

ligence, and the appellee grievously scalded by the steam and hot water.

The answer admits that an explosion occurred at the time and place alleged in the libel, and that the appellee was on board and was injured thereby, but denies that he was a passenger for hire, or that the explosion was the consequence of negligence.

The evidence shows that it is customary for the masters of steamboats to permit persons whose usual employment is on board of such boats, to go from place to place free of charge; that the appellee had formerly been employed as a waiter on board this boat; and just before she sailed from Sacramento he applied to the master for a free passage to San Francisco, which was granted to him, and he came on board.

It has been urged that the master had no power to impose any obligation on the steamboat by receiving a passenger without compensation.

But it cannot be necessary that the compensation should be in money, or that it should accrue directly to the owners of the boat. If the master acted under an authority usually exercised by masters of steamboats, if such exercise of authority must be presumed to be known to and acquiesced in by the owners, and the practice is, even indirectly, beneficial to them, it must be considered to have been a lawful exercise of an authority incident to his command.

It is proved that the custom thus to receive steamboat men is general. The owners must therefore be taken to have known it, and to have acquiesced in it, inasmuch as they did not forbid the master to conform to it. And the fair presumption is, that the custom is one beneficial to themselves. Any privilege generally accorded to persons in a particular employment, tends to render that employment more desirable, and of course to enable the employer more easily and cheaply to obtain men to supply his wants.

It is true the master of a steamboat, like other agents, has not an unlimited authority. He is the agent of the owner to do only what is usually done in the particular employment in which he is engaged. Such is the general result of the authorities. Smith on Mer. Law, 559; Grant v. Norway, 10 Com. B. 688, S. C. 2 Eng. L. and Eq. 337; Pope v. Nickerson, 3 Story, R. 475; Citizens Bank v. Nantucket Steamboat Co. 2 Story, R. 32. But different employments may and do have different usages, and consequently confer on the master different powers. And when, as in this case, a usage appears to be general, not unreasonable in itself, and indirectly beneficial to the owner, we

40 *

are of opinion the master has power to act under it and bind the owner.

The appellee must be deemed to have been lawfully on board under this general custom.

Whether precisely the same obligations in all respects on the part of the master and owners and their boat, existed in his case, as in that of an ordinary passenger paying fare, we do not find it necessary to determine. In the Philadelphia and Reading Railroad Company v. Derby, 14 How. R. 486, which was a case of gratuitous carriage of a passenger on a railroad, this court said: "When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of passengers should not be left to the sport of chance or the negligence of careless agents. Any negligence, in such cases, may well deserve the epithet of gross."

We desire to be understood to reaffirm that doctrine, as resting, not only on public policy, but on sound principles of law.

The theory that there are three degrees of negligence, described by the terms slight, ordinary, and gross, has been introduced into the common law from some of the commentators on the Roman law. It may be doubted if these terms can be usefully applied in practice. Their meaning is not fixed, or capable of being so. One degree, thus described, not only may be confounded with another, but it is quite impracticable exactly to distinguish them. Their signification necessarily varies according to circumstances, to whose influence the courts have been forced to yield, until there are so many real exceptions that the rules themselves can scarcely be said to have a general operation. In Storer v. Gowen, 18 Maine R. 177, the Supreme Court of Maine say: "How much care will, in a given case, relieve a party from the imputation of gross negligence, or what omission will amount to the charge, is necessarily a question of fact, depending on a great variety of circumstances which the law cannot exactly define." Mr. Justice Story, (Bailments, § 11,) says: "Indeed, what is common or ordinary diligence is more a matter of fact than of law." If the law furnishes no definition of the terms gross negligence, or ordinary negligence, which can be applied in practice, but leaves it to the jury to determine, in each case, what the duty was, and what omissions amount to a breach of it, it would seem that imperfect and confessedly unsuccessful attempts to define that duty, had better be abandoned.

Recently the judges of several courts have expressed their

disapprobation of these attempts to fix the degrees of diligence by legal definitions, and have complained of the impracticability of applying them. Wilson *v.* Brett, 11 Meeson & Wels. 113; Wylde *v.* Pickford, 8 Ib. 443, 461, 462; Hinton *v.* Dibbin, 2 Q. B. 646, 651. It must be confessed that the difficulty in defining gross negligence, which is apparent in perusing such cases as Tracy et al. *v.* Wood, 3 Mason, 132, and Foster *v.* The Essex Bank, 17 Mass. R. 479, would alone be sufficient to justify these complaints. It may be added that some of the ablest commentators on the Roman law, and on the civil code of France, have wholly repudiated this theory of three degrees of diligence, as unfounded in principles of natural justice, useless in practice, and presenting inextricable embarrassments and difficulties. See Toullier's Droit Civil, 6th vol. p. 239, &c.; 11th vol. p. 203, &c. Makeldey, Man. Du Droit Romain, 191, &c.

But whether this term, gross negligence, be used or not, this particular case is one of gross negligence, according to the tests which have been applied to such a case.

In the first place, it is settled, that "the bailee must proportion his care to the injury or loss which is likely to be sustained by any improvidence on his part." Story on Bailments, § 15.

It is also settled that if the occupation or employment be one requiring skill, the failure to exert that needful skill, either because it is not possessed, or from inattention, is gross negligence. Thus Heath, J., in Shields *v.* Blackburne, 1 H. Bl. 161, says, "If a man applies to a surgeon to attend him in a disorder for a reward, and the surgeon treats him improperly, there is gross negligence, and the surgeon is liable to an action; the surgeon would also be liable for such negligence if he undertook gratis to attend a sick person, because his situation implies skill in surgery." And Lord Loughborough declares that an omission to use skill is gross negligence. Mr. Justice Story, although he controverts the doctrine of Pothier, that any negligence renders a gratuitous bailee responsible for the loss occasioned by his fault, and also the distinction made by Sir William Jones, between an undertaking to carry and an undertaking to do work, yet admits that the responsibility exists when there is a want of due skill, or an omission to exercise it. And the same may be said of Mr. Justice Porter, in Percy *v.* Millaudon, 20 Martin, 75. This qualification of the rule is also recognized in Stanton et al. *v.* Bell et al. 2 Hawks, 145.

That the proper management of the boilers and machinery of a steamboat requires skill, must be admitted. Indeed, by the act of Congress of August 30, 1852, great and unusual precautions are taken to exclude from this employment all persons who do not possess it. That an omission to exercise this skill

vigilantly and faithfully, endangers, to a frightful extent, the lives and limbs of great numbers of human beings, the awful destruction of life in our country by explosions of steam boilers but too painfully proves. We do not hesitate therefore to declare that negligence in the care or management of such boilers, for which skill is necessary, the probable consequence of which negligence is injury and loss of the most disastrous kind, is to be deemed culpable negligence, rendering the owners and the boat liable for damages, even in case of the gratuitous carriage of a passenger. Indeed, as to explosion of boilers and flues, or other dangerous escape of steam on board steamboats, Congress has, in clear terms, excluded all such cases from the operation of a rule requiring gross negligence to be proved to lay the foundation of an action for damages to person or property.

The thirteenth section of the act of July 7, 1838, (5 Stat. at Large, 306,) provides: "That in all suits and actions against proprietors of steamboats for injury arising to persons or property from the bursting of the boiler of any steamboat, or the collapse of a flue, or other dangerous escape of steam, the fact of such bursting, collapse, or injurious escape of steam shall be taken as full *primâ facie* evidence sufficient to charge the defendant, or those in his employment, with negligence, until he shall show that no negligence has been committed by him or those in his employment."

This case falls within this section; and it is therefore incumbent on the claimants to prove that no negligence has been committed by those in their employment.

Have they proved this? It appears that the disaster happened a short distance above Benicia; that another steamer called the Wilson G. Hunt, was then about a quarter of a mile astern of the New World, and that the boat first arriving at Benicia got from twenty-five to fifty passengers. The pilot of the Hunt says he hardly knows whether the boats were racing, but both were doing their best, and this is confirmed by the assistant pilot, who says the boats were always supposed to come down as fast as possible; the first boat at Benicia gets from twenty-five to fifty passengers. And he adds that at a particular place called "the slough" the Hunt attempted to pass the New World. Fay, a passenger on board the New World, swears, that on two occasions, before reaching "the slough" the Hunt attempted to pass the New World, and failed; that to his knowledge these boats had been in the habit of contending for the mastery, and on this occasion both were doing their best. The fact that the Hunt attempted to pass the New World in "the slough" is denied by two of the respondents' witnesses, but they do not meet the testimony of Fay, as to the two pre-

vious attempts. Haskell, another passenger, says, "about ten minutes before the explosion I was standing looking at the engine, we saw the engineer was evidently excited, by his running to a little window to look out at the boat behind. He repeated this ten or fifteen times in a very short time."[1] The master, clerk, engineer, assistant engineer, pilot, one fireman, and the steward of the New World, were examined on behalf of the claimants. No one of them, save the pilot, denies the fact that the boats were racing. With the exception of the pilot and the engineer, they are wholly silent on the subject. The pilot says they were not racing. The engineer says: "We have had some little strife between us and the Hunt as to who should get to Benicia first. There was an agreement made that we should go first. I think it was a trip or two before." Considering that the master says nothing of any such agreement, that it does not appear to have been known to any other person on board either boat, that this witness and the pilot were both directly connected with and responsible for the negligence charged, and that the fact of racing is substantially sworn to by two passengers on board the New World, and by the pilot and assistant pilot of the Hunt, and is not denied by the master of the New World, we cannot avoid the conclusion that the fact is proved. And certainly it greatly increases the burden which the act of Congress has thrown on the claimants. It is possible that those managing a steamboat engaged in a race may use all that care and adopt all those precautions which the dangerous power they employ renders necessary to safety. But it is highly improbable. The excitement engendered by strife for victory is not a fit temper of mind for men on whose judgment, vigilance, coolness and skill the lives of passengers depend. And when a disastrous explosion has occurred in such a strife, this court cannot treat the evidence of those engaged in it, and *primâ facie* responsible for its consequences, as sufficient to disprove their own negligence, which the law presumes.

We consider the testimony of the assistant engineer and fireman, who are the only witnesses who speak to the quantity of steam carried, as wholly unsatisfactory. They say the boiler was allowed by the inspector to carry forty pounds to the inch, and that when the explosion occurred, they were carrying but twenty-three pounds. The principal engineer says he does not remember how much steam they had on. The master is silent on the subject and says nothing as to the speed of the boat. The clear weight of the evidence is that the boat was, to use the language of some of the witnesses, doing its best. We are not convinced that she was carrying only twenty-three pounds, little more than half her allowance.

This is the only evidence by which the claimants have endeavored to encounter the presumption of negligence. In our opinion it does not disprove it; and consequently the claimants are liable to damages, and the decree of the District Court must be affirmed.

Mr. Justice DANIEL dissented.

Mr. Justice DANIEL.

From the opinion of the majority of the judges in this case I dissent.

That the appellee in this case has sustained a serious injury cannot, consistently with the proofs adduced, be denied, and it is probable that the compensation which has been awarded him may not be more than commensurate with the wrong inflicted upon him, or greater than that for which the appellants were justly responsible. But the only question in my view which this court can properly determine, relates neither to the character nor extent of the injury complained of, nor to the adequacy of the redress which has been decreed. It is a question involving the power of this court to deal with the rights or duties of the parties to this controversy in the attitude in which they are presented to its notice.

This is a proceeding under the admiralty jurisdiction, as vested in the courts of the United States by the Constitution. It is the case of an alleged marine tort. The libel omits to allege that the act constituting the gravamen of the complaint, did not occur either *infra corpus comitatus,* nor *infra fauces terræ.* It will hardly be denied that the rule of the admiralty in England, at the time of the adoption of the Constitution, confined the jurisdiction of the admiralty within the limits above referred to, or that the admiralty never had in England general or concurrent jurisdiction with the courts of common law, but was restricted to controversies for the trial of which the *pais,* or local jury, could not be obtained. Having on a former occasion investigated extensively the origin and extent of the admiralty powers of the federal courts, (see New Jersey Steam Navigation Company *v.* Merchants Bank, 6 How. 344,) it is not now my purpose to do more than to refer to that examination, and to maintain my own consistency by the reassertion of my adherence to the constitutional principles therein propounded, principles by which I am constrained to deny the jurisdiction of this court and of the Circuit Court, in the case before us.

It is true that the libel in this case alleges the injury to have been committed within the ebb and flow of the tide, but it is obvious that such an allegation does not satisfy the description

of an ·occurrence which to give jurisdiction must be marine or nautical in its character and locality. Although all tides are said to proceed from the action of the moon upon the ocean, it would be a *non sequitur* should the conclusion be attempted that therefore every river subject to tides was an ocean.

It to my view seems manifest, that an extension of admiralty jurisdiction over all waters affected by the ebb and flow of the tide, would not merely be a violation of settled and venerable authority, but would necessarily result in the most mischievous interference with the common law and internal and police powers of every community. Take one illustration which may be drawn from subjects within our immediate view.

In the small estuary which traverses the avenue leading to this court room, the tides of the Potomac regularly ebb and flow, although upon the receding of the tide this watercourse can be stepped over. Upon the return· of the tide there may be seen on this water numerous boys bathing or angling, or passing in canoes. Should a conflict arise amongst these urchins, originating either in collision of canoes or an entangling of fishing lines, or from any similar cause, this would present a case of admiralty jurisdiction fully as legitimate as that which is made by the libel in the case before us. Yet the corporate authorities of Washington would think strangely no doubt of finding themselves, by the exertion of a great national power designed for national purposes, ousted of their power to keep the peace, and to inflict upon rioters within their notorious limits, the discipline of the workhouse. .

I am opposed to every assumption of authority by forced implications and constructions. I would construe the Constitution and the statutes by the received acceptation of words in use at the time of their creation, and in obedience to this rule, I feel bound to express my belief that, in the present and in all similar cases, this court has no jurisdiction under the Constitution of the United States.

## Order.

This cause came on to be heard on the transcript of the record, from the District Court of the United States for the Northern District of California, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause, be, and the same is hereby affirmed, with costs and interest, at the same rate per annum that similar decrees bear in the courts of the State of California.