Woods, C. J.
The Reliance was a passenger and freight steamboat, making regular trips by the middle route between Jacksonville, Florida, and Savannah, Georgia. On September 3, 1878, about 10 o’clock p. m., she left Jacksonville, bound for Savannah. On that trip the libellant was a pay passenger. Between 11 and 12 o’clock on the night of that day, as the Reliance was going up the St. Mary’s river, one of her boilers exploded. The result of the explosion was ta throw overboard her other boiler and to break in the lower forward saloon.
At the time of the explosion the libellant was sitting on the port side of the upper deck. He was thrown upwards by the-explosion and fell upon the deck 10 or 12 feet from where he had been sitting at the time of the explosion. His right leg was. broken at the neck of the trachanter, and his elbow and hand were bruised. He was taken to a hospital in Savannah for-treatment, and for weeks suffered great pain from his injuries. As a result of the fracture he was crippled for life, his injured leg being shortened about an inch and a half.
The libellant was an Episcopal clergyman, and at the tim&. of his injuries aged 37 years, and was of sound bodily health. At the time of the explosion William Moultrie, first engineer *250 of the boat, was in charge of the engine; he was killed by the explosion; he went on duty at 6 o’clock that evening. Mark Davis was fireman on duty at the same time.
John Sherman was second engineer, and was relieved by Moultrie at 6 o’clock. When Moultrie relieved him he told Sherman that when the latter came on watch again that night he should keep a strict lookout for everything, and to be sure to keep his eyes on the pump and to see that it continued to work.
At the time of the explosion, Moultrie, the engineer, was in his usual position, in full view of the glass and water-gauges.
The explosion was preceded by a humming or whistling noise, and water and ashes came from under the port boiler and were blown forward.
The testimony touching the character of Moultrie, the engineer on duty when the explosion took place, was conflicting; some of the witnesses spoke of him as a sober, careful and competent engineer, and very faithful and attentive to his duties. One witness, however, stated that about two weeks before the explosion he saw him on the wharf at Savannah, while the boat was getting up steam, so drunk as to be unfit to run an engine in any steamer. The witness said he spoke to Mr. Benson, the agent of the boat, about the condition of Moultrie at that time, and Mr. Benson said the company intended to get rid of him as soon as possible.
The evidence showed that the boilers and machinery of the boat were in good order and repair just before the explosion. The boilers had been repaired and inspected in August preceding, and a short time before the trip on which the explosion occurred had been cleaned out, and were apparently sound and good. The pump was a good one, and had never been known to fail.
There was a glass water-gauge, and there were water-cocks for ascertaining the quantity of water in the boilers. The evidence showed that it was necessary to try the water-cocks, as well as to examine the glass water-gauge, in order to ascertain the height of the water in the boilers; that it was *251 not prudent to rely entirely on the glass water-gauge, which was likely to choke up and deceive the engineer. There was some conflict in the evidence whether it was customary on the boat to test the water by the water-cocks.
After the explosion a piece of the bottom of one of the boilers was found in the boat. It was hard and brittle, and broke under the shears. Its tensile strength had been lost to the extent of 5,000 or 6,000 pounds by being heated and chilled. It, had been burnt by fire. It was in evidence that it was the duty of an engineer to prevent the burning of his boilers, and that when they were allowed to burn there was a presumption of negligence.
The Reliance was allowed to carry 80 pounds of steam, but she not unfrequently carried from 82 to 83 pounds, and it was often necessary for her to carry this amount to make up her time. Just before the explosion the steam-gauge in the cabin indicated a steam pressure of 72 pounds.
The libellant was without fault, and his inj uries were received without any negligence or carelessness on his part.
The carriers of passengers are not insurers of the safety and lives of those whom they carry. Ang. on Car. § 536; 2 Greenl. on Ev. § 222; Christie v. Griggs, 2 Camp. 79; Israel v. Clark, 4 Esp. 259; Aston v. Heavier, 2 Esp. 533; Meir v. Penn. R. Co. 64 Penn. St. 225; McPadden v. N. Y. Cent. R. Co. 44 N. Y. 478; Daniel v. Metropolitan R. Co. L. Rep. 5 H. L. 45.
Nevertheless, a carrier of passengers is bound to exercise the utmost knowledge, skill and vigilance to carry his passengers in safety. Curtis v. The Rochester & Syracuse R. Co. 18 N. Y. 543; Steamboat New World v. King, 16 How. 469; Stokes v. Suttonstall, 13 Pet. 181.
In the last case cited the supreme court says: “It is certainly a sound principle that a contract to carry passengers differs from a contract to carry goods. Eor the goods the carrier is answerable at all events, except an act of God and the public enemy. But, although he does not warrant the safety of the passengers at all events, yet his undertaking and liability as to them go to this extent, that he or his agent, if he *252 acts by an agent, shall provide competent skill, and that, so far as human care and foresight can go, he will transport them safely.”
The explosion of the boiler, and the consequent injuries to the libellant, are, of themselves, prima facie evidence of negligence.
In Christie v. Griggs, 2 Camp. 69, Sir James Mansfield, chief justice, said: “I think the plaintiff has made a prima facie case by proving his going in the coach, the accident, and the damage he has suffered. When the breaking down or overturning of the coach is proved, negligence on the part of the owner is implied.”
This case is cited with approbation by the supreme court in Stokes v. Suttonstall, supra; in Railroad Company v. Pollard, 22 Wall. 341. The case of Stokes v. Suttonstall, 13 Pet. 181, was approved, and it was declared that in a suit against a railroad company for an injury to a passenger, if it appeared that the passenger was in the exercise of that degree of care which might be reasonably expected from a person in his situation, and injuries occur to him, this is prima facie evidence of the carrier’s liability.
In the present case, where the injury was caused by the explosion of the boiler of the steamboat, while the same was in charge of the servants of the boat, there can be no question that the explosion itself makes out a prima facie case of negligence, and, unless this presumption is rebutted, entitles the libellant to recover.
The question for decision upon the facts is, therefore, has the respondent rebutted this presumption ?
The proof shows that the boilers of the Eeliance and her machinery were in good order. The boilers had been recently repaired and had been inspected by one of the government inspectors at Savannah, and had been cleaned out a short time before. At the time of the explosion there were on defects apparent in the boat, her boilers or machinery.
The explosion must, therefore, have been caused either by some latent defect which the closest examination could not *253 discover, or by the negligence of those in charge of the boilers and machinery, and it is incumbent on the respondent to show that the disaster was caused by the former, and not by the latter.
There is no direct proof whatever that there was any defect in the boiler or machinery of the boat to which the explosion could be attributed. The respondent, however, seeks to draw the inference that there was such defect from the proof tending to show the good character of the engineer for sobriety, skill and attention to his duties, and from the fact that just before the explosion he was at his post apparently attending to his duties; but there is evidence on the record tending to rebut this proof of the respondent. It is shown that the engineer was not always sober, and there is evidence tending to show that the glass gauge was relied on to ascertain the height of water in the boilers, and that the water-gauge cocks were not used for that purpose. This, according to the evidence of the government inspector, would be negligence, because a glass gauge is likely to choke up and deceive the engineer.
But the fact which, to my mind, rebuts the inference to be drawn from the alleged good character of the engineer, and his attention to his duties, is found in the condition of that part of the boiler which was left in the boat after the explosion. The government inspector says, in reference to this fragment of the boiler: “I examined it with Mr. Henderson. We had it cut, but did not cut the worst part of it, as we desired to keep it for further information. The piece we had cut was hard and brittle, and it broke under the shears; its tensile strength had been taken away to the extent of about 5,000 or 6,000 pounds by being heated and chilled; it had been burned by fire.”
This witness adds: “It is an engineer’s duty to prevent the burning of the boilers, and the presumption is that when they do burn it is negligence.” On this point Sherman, the second engineer, says: “I would consider it great carelessness to let your boiler bum; it could not happen without great carelessness.”
*254 The respondent claims that the piece of the boiler found on the deck might have been burned after the explosion by the fire left in the furnace. This is mere conjecture, without any evidence to support it, and the result of the explosion, as disclosed by the evidence, renders such a theory extremely improbable. This evidence makes it perfectly clear that the boilers of the boat were not in a sound condition at the time of that explosion, and that their unsafe condition was due to the carelessness of the engineers, or one of them. It may have been owing to the carelessness of Moultrie, the engineer on duty at the time of the explosion, or of the second engineer, Sherman, who admitted after the disaster that it was not his habit to try the water-gauge cocks, and who for this negligence has had his license revoked.
It is also in evidence that the boat very frequently carried more passengers than she was allowed to. With all this testimony touching the management of the boat by her engineers and the condition of the boilers at the time of the explosion, we are asked to find that the explosion was caused by some hidden defect in the material out of which the boilers were constructed, and not to defects caused by carelessness and bad management. No hidden defect is shown to exist, and we are asked to infer it from the good character of the engineers. The facts prove that the engineers were careless and negligent, and the result of that negligence is shown by the condition of the boilers at the time of the explosion. The natural and almost unavoidable inference is that the explosion was the result of the bad treatment of the boilers by the engineers, and not the result of some concealed flaw.
In my judgment, the presumption of negligence arising from the fact of the explosion is not removed, but is greatly strengthened, by the evidence in the case, and the libellant must have a decree for the damage that he has sustained.
Upon the facts, as disclosed by the evidence, I estimate his damage at $5,000, and direct a decree in his favor against the boat for that sum, and costs, both in this court and in the district court.