JOHN KENNEDY *vs.* PACIFIC MAIL STEAMSHIP COMPANY; ALFRED IVERSON *vs.* PACIFIC MAIL STEAMSHIP COMPANY; THOMAS ROE *vs.* PACIFIC MAIL STEAMSHIP COMPANY; PATRICK MURPHY *vs.* PACIFIC MAIL STEAMSHIP COMPANY; and GEORGE M. MORRISEY. *vs.* PACIFIC MAIL STEAMSHIP COMPANY.

## April 30, 1906.

*Gratuitous Undertaking:* If a party undertakes gratuitously to perform a service for another and enters upon its execution, the fact of the gratuitous nature of the undertaking does not relieve such party from liability to the other for the results of his own negligence in its performance.

In Admiralty: Libel *in personam* for damages for breach of contract.

Geo. A. Davis, Proctor for Libellants.

Kinney, McClanahan & Cooper, Proctors for Libellee.

DOLE, J.   The following order of consolidation was entered in the case of Kennedy v. Pacific Mail Steamship Company:

"Upon consent of respective proctors for the libellant and "the libellee given in open court, it is hereby ordered that all "the evidence given *viva voce* as well as by deposition given and "read in this suit may be considered as given and read in each "of the following suits, which are together with the above en-"titled suit consolidated for the purposes of trial; and that sepa-"rate findings and decrees may be made and entered herein:

"Alfred Iverson vs. Pacific Mail Steamship Company;

"Patrick Murphy vs. Pacific Mail Steamship Company;

"Geo. A. Morrisey vs. Pacific Mail Steamship Company;

"Thomas Roe vs. Pacific Mail Steamship Company.

"Done in open court this 4th day of January, A. D. 1906."

The libels in these cases are substantially the same except as to names of libellants.

The story in these cases as shown by the pleadings and evidence to the point of issue, is substantially as follows:

The libellants, in August, 1905, signed articles with libellee in San Francisco of the State of California, whereby they agreed to ship as seamen on libellee's steamship "Barracouda" on a nine months' voyage to an unknown port in Siberia at wages agreed upon. The said "Barracouda" proceeded on said voyage with the libellants on board and was afterwards captured by the Japanese, and her crew, including libellants, were taken before a Japanese court by which they were discharged; and thereafter, on or about the 16th day of October, 1905, at the instance of the captain or other officer of said "Barracouda," libellee took libellants and the rest of the crew of the "Barracouda" on board its steamship "Mongolia," then in Yokohama, in the Empire of Japan, for the purpose of transporting them to said San Francisco, issuing tickets to them, which, after leaving port, were taken back in exchange for steerage or passenger checks, of one of which the following is a copy:

"(2—1 05—3M)                                    S G 63
"              Pacific Mail Steamship Company .
"                    STEERAGE CHECK
"Steamer............."Mongolia"................Voy. 7.
"Name..............J. Kennedy.
"From..............Yokohama to San Francisco.
"No. Ticket.........9115.
"       (Stamped)              A. E. Rennie      Purser
"          Good for this trip only—To be shown and .
"                  returned when called for;"

this being the copy of the check issued by libellee to libellant John Kennedy, in exchange for his ticket first issued to him.

Similar checks were issued to each of the other libellants in exchange for their tickets.

Before the arrival of the said steamship "Mongolia" off the port of Honolulu on her way to said San Francisco, officials of the United States Marine Hospital Service in the Territory of Hawaii, acting under the laws of the United States and the regulations of the United States Treasury Department, issued an order that steerage passengers of incoming steamships should not be allowed to land at said Honolulu, notice of which order was given on board of the said steamship "Mongolia" upon her arrival off said port of Honolulu. After the said vessel reached the dock at said port of Honolulu, libellants went ashore and upon attempting to return on board the same day for the continuance of their poyage, were refused admittance by the agents of the libellee and were left in said Honolulu, the steamship "Mongolia" proceeding on her voyage to San Francisco on the succeeding day.

The libellee, in its answer, raises a question of law in regard to these passenger checks, admitting that they were issued to libellants, but denying that they were tickets or contracts for the passage of libellants, or that they entitled libellants to passage from said Yokohama to said San Francisco. No samples of the tickets which were first delivered to them, are in evidence, but the checks which were later given to them in exchange for such tickets, stamped by the purser with his name, A. E. Rennie, Purser, implies an agreement to transport them from Yokohama to San Francisco, giving the numbers of tickets which may be presumed to be the tickets which they gave up to the purser in exchange for the checks. With these checks in their hands and the circumstance of their coming on board and beginning the voyage by virtue of such checks and the tickets for which they were exchanged, the burden of proof is clearly upon the libellee to show that there was no contract between it and these libellants. The libellee alleges that neither libellants nor anyone else paid anything for their transportation from Yokohama to San Francisco. This may be taken

as correct as the libel does not allege consideration. I find, however, that there was a definite undertaking on the part of the libellee to carry libellants from Yokohama to San Francisco on board the steamship "Mongolia" as shown by the checks in question and by all of the undisputed facts in the case pertaining to that transaction; and that the fact of such engagement being possibly gratuitous so far as the evidence in the case shows, does not relieve the libellee from responsibility for its own negligence on the voyage injuriously affecting the libellants, if any such negligence exists.

"The confidence induced by undertaking any service for another, is a sufficient legal consideration to create a duty in the performance of it." *Coggs v. Bernard,* (L. Raymond, 909); 1 Smith's Leading Cases, 346, 355.

"If a party who makes this engagement (the gratuitous performance of business for another) enters upon the execution of the business, and does it amiss, through the want of due care, by which damage ensues to the other party, an action will lie for this misfeasance." *Thorne v. Dias,* 4 Johns. (N. Y.) 84; *Steamboat New World v. King,* 57 U. S. 469; *Boyce v. Anderson,* 27 Id. 149; *Almy v. Cotton Bros. & Co., ante,* pp. 163, 169.

The following issues of fact were raised by the further pleadings and evidence:

*First.* Were the libellants informed by the libellee of the order of the officials of the United States Marine Hospital Service against their going ashore at Honolulu?

*Second.* Was the refusal of the libellee to allow libellants to return on board the "Mongolia" at Honolulu, lawful or justifiable under the circumstances?

The steerage steward, called by the libellee, testified that he gave notice to all of the steerage passengers of the regulations against going ashore before the "Mongolia" reached the dock, and that later he stationed himself at the gangway and again notified such steerage passengers as attempted to go down the gangplank, and he says specifically that he told Alfred

Iverson, one of the libellants, while he was on deck and also while he was at the foot of the gangway. Iverson came down the gangway with three or four others and he told them to stop, that they could not go ashore and if they did they would have to stay and that they went ashore in spite of him. He failed to identify any other of these men, but said they were all "Barracouda" passengers. Although several witnesses were produced by the libellee to support the statements of the steward in regard to giving the notice that steerage passengers were not to go ashore, none of these witnesses were able to state that such notice was given to any of these libellants. The one who comes nearest to it is a witness by the name of Charles A. Miller, who was one of the crew of the "Barracouda" and must have known all of these men by sight. He testified that he could not say that every one of the "Barracouda's" crew were present when the steward gave the notice, but he did say that every one as he passed down the gangway was told and that he saw them all going ashore. Then he qualified this statement and said, "I didn't see every one of them. I saw some of them going," and heard the steward at the gangway tell them not to go ashore. On cross-examination, he said in answer to the question, "Did you see Mr. Iverson go ashore?" "I see him on shore," on the dock. This evidence fails to support the steward's statements of notifying these men on board, or notifying them on the gangway. The steward, Mr. Trome, was naturally anxious to prove that he had done his duty in notifying all of the steerage passengers, but it is evident that such notice was given in a careless and loose way and with such want of thoroughness that it is quite probable that he did not reach and did not notify every one of the steerage passengers. He admits leaving the gangway during the afternoon. Mr. Jensen, who was the quartermaster of the "Barracouda," was called by the libellee and he testified that he was not notified about going ashore either on board or at the gangway; that he reached the dock gate to go out and there was refused and notified for the first time. This proves quite conclusively that the steward's

methods of giving notice were far from efficient. There was no excuse for this. It certainly would have been a practical and easy matter in an important regulation of this kind that the steward should have taken the list of the steerage passengers and looked up the persons corresponding to each name on the list, notified them and checked them off, and if he had taken a waiter or some one acquainted with the steerage passengers as a witness with him, it would have made his work and the means of proving it, thorough and satisfactory. The weight of evidence is entirely on the side of libellants on this point and I find that they were not notified of the Marine Hospital regulations against going ashore. They gave their testimony with apparent readiness and frankness, and no weakness was developed in it by the skillful cross-examination that some of them went through. This conclusion is strengthened by the well established circumstance that after the libellants went ashore they met the purser who scolded them for coming ashore and told them that unless they got back to the wharf by five o'clock and were fumigated the next day they would not be taken on board, whereupon they all went back but were refused admittance to the wharf. This failure on the part of the libellee to notify libellants of the orders of the Marine Hospital officials was negligence on the part of the former, and makes it liable for such injury as was suffered by the libellants as a consequence of such negligence.

The libellee still had a chance to save itself from anything more than slight or nominal damages, by saving the libellants from resulting injury. It still had it within its power to provide opportunities for libellants to perform the required quarantine regulations and return on board. The libellants were notified by the purser to be back at the wharf at five o'clock and be fumigated the next day. They all went back at about five o'clock and were refused admittance. This was in the afternoon. They wandered away and returned at about nine o'clock in the evening and were again refused admittance and told to come the next morning at nine o'clock, when by all

the evidence on the matter of preparation by fumigation and the performance of a period of quarantine before arriving in San Francisco, it would have been too late.

It is explained by witnesses for libellee that Dr. Hobdy, the acting head of the Marine Hospital Service, could not be found at five o'clock and that every attempt was made to do so over the telephone. It may be that the failure of the arrangements for giving the libellants opportunity for performing the necessary conditions for getting back to the ship was due more to the misfortune than the fault of the libellee, but the fact stands that these men, judging by their actions, desired to carry out such conditions and were reasonably attentive to the instructions given as to the times when they should present themselves at the wharf entrance for beginning the same, but failed to receive from the libellee proper attention and consequently did not have an opportunity of doing what was a necessary condition for continuing the voyage.

The libellee had still another opportunity of reducing the injury suffered by libellants to a small amount, and this was to provide for their transportation to San Francisco on another vessel and their necessary expenses until such vessel should sail. The libellants after the departure of the "Mongolia," called on the agent of the libellee to find out what could be done for them and were refused all assistance; they, or one of them applied for payment on account of wages, which was refused. Later in the day, Mr. Chillingworth, representing libellants, applied at the agent's office for their transportation to San Francisco and their expenses in Honolulu, the agent put him off saying he would see about it,—what arrangement he could make, and would see him again. Chillingworth didn't call again, but Mr. Davis, who later became engaged in the matter, called, probably on Monday, two days later, and was told by the agent that libellants would be sent to San Francisco on the "China" and their expenses at the Sailors' Home paid. Later on the libellee made a similar proposition in writing to libellants. These proposals were refused or ignored by libel-

29—U. S. D.

lants, they having then become involved in obligations for their expenses and, by the time the last proposition was received, for legal advice.

These men, on Saturday, the day they were left behind by the sailing of the "Mongolia," were without resources.      They had already experienced one night of privation without a place to sleep; their request for assistance from libellee had been refused.      Under these circumstances they made arrangements with Chillingworth for their living expenses and cannot be blamed for doing so.      On Monday or after, they entered into arrangements with Davis as their counsel to sue the libellee for damages, nor can they be blamed for this.      The libellee by its negligence in allowing them to go ashore became liable for whatever damage was suffered by the libellants as the result of that negligence, which they did not contribute to.      I do not think that they were responsible for any of the unfortunate experiences they went through as the result of their going ashore from the "Mongolia."      They were entitled to be treated with all the attention and consideration that their situation demanded exactly as if they had been cabin passengers, subject, of course, to the distinction made by the quarantine regulations.

As to the damages suffered by libellants in consequence of the negligence of the libellee in failing to notify them of the quarantine regulations against their going ashore, they incurred expenses for board and lodging up to the time of the giving of their evidence, to the amount of one hundred and forty-two ($142.00) dollars, in the aggregate.      Some of them lost clothes, one of them had further expenses for food in serving quarantine conditional on leaving by a later vessel.      They became involved in the present litigation; they lost considerable time and suffered the natural mental distress consequent upon the uncertainty and hardships of their conditions.      I will sign a decree in each of the above cases awarding each libellant one hundred and fifty ($150.00) dollars and costs.