## EMIE HIPPE AND ANOTHER v. DULUTH BREWING & MALTING COMPANY AND ANOTHER.[1]

July 31, 1953.

No. 35,937.

[1]Reported in 59 N. W. (2d) 665.

*Erlandson & Erlandson* and *Ryan, Ryan, Ryan & Ebert,* for appellants.

*Richards, Janes, Hoke,. Montgomery & Cobb* and *Reavill, Jenswold, Neimeyer & Johnson,* for respondent Duluth Brewing & Malting Company.

*Thomas P. Welch,* for respondent Litchfield Produce Company.

CHRISTIANSON, JUSTICE.

Plaintiffs appeal from an order of the district court denying their motion for vacation of the verdict in favor of defendants returned under direction of the court and for a new trial. Four actions were consolidated in the district court for trial and are consolidated here on appeal. Three of the actions are for the wrongful deaths of Delbert, Delores, and Donald Hippe, which resulted from a fire allegedly caused by defendants' negligence, and are brought by Emie Hippe, as administratrix of the estates of the three decedents, for the benefit of herself and Ben Hippe, as parents and next of kin of the three decedents. The fourth action is brought by Ben Hippe to recover damages for destruction of a building and personal property by the same fire. Defendants in all four actions are the Duluth Brewing & Malting Company and the Litchfield Produce Company.

The building destroyed by the fire was divided into three main sections. It was a large frame building with a south or front wall approximately 122 feet long. The first section, on the east end of the building, occupied about 12 feet of frontage and extended some 34 feet toward the rear. It contained a bedroom, dining room, and kitchen on the first floor and three bedrooms on the second floor, and it was used as living quarters by the Hippe family and two employees. Adjoining the living quarters immediately to the west was the center section of the building, which housed a combined general store and tavern. This section was also two stories high, the upper story being unfinished, and it occupied some 40 feet of frontage and was about 76 feet deep. The remaining 70 feet of frontage was taken up by a combined dance hall and roller skating

rink, which was a single-story section extending about 34 feet toward the rear.

Of the 40-foot section of the south wall that made up the front of the store-tavern, about 30 feet were taken up by windows. In the southwest corner of the store-tavern were two doors, one in the south wall leading outside to the area in front of the store-tavern and the other in the west wall leading into the adjoining dance hall. Just north of the latter door on the west wall of the store-tavern was a double toggle switch on a single wall plate. The electric wires from one switch led to an outdoor yard light. During remodeling of the store-tavern, the wires from the other switch had been run behind the wall surface over the two doors to a point above the front windows where they were to be connected to an electric neon Karlsbrau beer sign.

Karlsbrau beer, manufactured by defendant Duluth company, was one of the items carried by plaintiffs in their store-tavern in 1940. It was sold to plaintiffs by defendant Litchfield company, the local distributor of Karlsbrau beer, who bought the beer wholesale from the Duluth company and delivered it to its retail customers in its own trucks. In May or June of that year, plaintiffs asked Clarence Froehle, who had charge of the Litchfield company's beer business, to obtain a neon sign for the windows of the store-tavern. Froehle asked for and received from the Duluth company three signs and the electric transformers necessary to their operation; the Litchfield company in turn delivered one sign and transformer to plaintiffs.

The transformer operated on standard 110-120-volt house current, for which plaintiffs' store-tavern was wired. The current entered the primary or low side of the transformer and emerged from the secondary or high side as 12,000-volt current, which was necessary to light the neon sign. An experienced sign contractor testified that this high-voltage, low-amperage current was not dangerous to human life but had a high propensity to spark between the two wires leading from the high side of the transformer, or between one wire and another part of the same wire, or between one

wire and certain other substances. The witness testified that the spark could jump up to one and one-quarter inches and that, if the power were left on for several hours, the spark could even eat through insulation and then jump that distance.

There is a dispute in the testimony regarding who installed the transformer. Plaintiffs testified that Froehle himself installed it; Froehle testified that the Litchfield company hired a licensed electrician to install it and was reimbursed for the cost by the Duluth company. The transformer was installed above the front windows where the ceiling and front wall came together, about nine or ten feet from the floor, and was connected to the wires running to that point from one of the switches on the west wall near the door leading to the dance hall. Two wires hung down about 18 inches from the high side of the transformer to be connected to the neon sign. After the transformer was installed, it was discovered that the neon sign was cracked and could not be used. Froehle said that he would replace the sign later, and the transformer was left in position with the two secondary wires hanging down below the top of the window, each bare of insulation for about two inches on the end. No other sign was ever delivered.

During the Christmas season of 1940, following installation of the transformer, plaintiffs hung crepe paper decorations in the front windows of the store-tavern. One night Mrs. Hippe operated what she thought to be the switch to the outdoor yard light and went out into the yard. The yard light was not on and when she returned the decorations in the vicinity of the exposed secondary wires were burning. The fire was extinguished without difficulty and the decorations were removed. Mrs. Hippe testified that she then realized she had mistakenly operated the wrong switch, energizing the transformer instead of turning on the yard light. The following day plaintiffs' son Donald, then 14 years old, covered the bare ends of the transformer wires with friction tape and bent the wires up so that they no longer hung below the top of the window.

Some seven years passed without further incident. Then, on the evening of May 12, 1948, Mr. Hippe had to go out into the yard to attend to some customers' wants at about ten o'clock. As he went out he operated one of the wall switches, intending to turn on the yard light, but he is not sure which switch he in fact operated. When the customers left, Mr. Hippe went to bed in the downstairs bedroom where Mrs. Hippe was already asleep. The three Hippe children and the two employees were sleeping in the upstairs bedrooms. Mrs. Hippe was awakened about four o'clock the next morning by screams from overhead and other noises. She woke Mr. Hippe and, when they went into the store-tavern, they saw flames in an area surrounding the transformer and going up through the ceiling above the transformer. They summoned aid but were unable to control the fire. The building and its contents were completely destroyed. One employee was able to escape from a bedroom upstairs, but the other employee and the three Hippe children perished in the fire.

At the close of plaintiff's evidence, the trial court granted motions of both defendants for directed verdicts in their favor in all four cases on the grounds that there was insufficient evidence to support a verdict for plaintiffs and that plaintiffs' contributory negligence appeared as a matter of law.

■ Plaintiffs seek to invoke the doctrine of *res ipsa loquitur* to make defendants' negligence a question for the jury. However, a necessary element of the doctrine is that the defendant have exclusive control of the instrumentality causing the harm.[2] Plaintiffs' evidence shows that their own son Donald exercised substantial control over the transformer in taping and bending up the secondary wires which had been left hanging. Such acts were not mere normal use of the instrumentality for the purpose and in the manner in which it was intended to be used, such as were held not to inter-

[2]Johnson v. Coca Cola Bottling Co. 235 Minn. 471, 51 N. W. (2d) 573; Peterson v. Minnesota Power & Light Co. 207 Minn. 387, 291 N. W. 705; 4 Dunnell, Dig. & Supp. § 7044; Prosser, Torts, § 43, p. 298.

rupt defendant's exclusive control in Peterson v. Minnesota Power & Light Co. 207 Minn. 387, 291 N. W. 705.[3] Rather, they were acts of control over the factors operating to cause the injury under plaintiffs' theory of the case; namely, the position and condition in which the secondary wires were left. This is not a proper case for application of *res ipsa loquitur*.

■ Plaintiffs also seek to make defendants' negligence a jury question on the theory that defendants were suppliers of a defective chattel. This attempt must also fail. There was no evidence to support a finding that the transformer was in any way defective had its secondary wires been properly connected to a neon sign rather than left hanging. The negligence, if any, was in the manner in which the transformer was installed or, more precisely, in the condition in which it was left when the installation of both the transformer and sign together could not be completed.

■ Irrespective of *res ipsa loquitur* or the supplying of a defective chattel, there was sufficient evidence to have made it a jury question whether leaving the transformer connected to a source of power for a long period of time without completing installation of the sign constituted negligence under the circumstances. In view of the fact that the switch which would energize the transformer was located where it was accessible to anyone entering or leaving the store-tavern and where it could easily be operated mistakenly by anyone intending to turn on the yard light, the jury could properly have found it foreseeable that the transformer might be energized and produce current having the dangerous sparking qualities previously mentioned. Although there was no evidence that sparking would have occurred had the secondary wires remained in the position in which they were left when installed, the jury could further have found it foreseeable that the Hippes would, after a lapse of time, change the position of the wires and that in doing so they would fail to realize the danger and thus fail to properly protect against it. The evidence being sufficient to sustain findings of foreseeability as to these matters, a further finding that it was negligence to leave the transformer in the condition in which it was

[3]See, also, Johnson v. Coca Cola Bottling Co. *supra*.

left without giving suitable warning would have been permissible. The evidence would have justified a finding of negligence and, insofar as the directed verdict was based upon lack of negligent conduct, it was in error.

■ The next issue presented is whether the negligence, assuming it were found to exist, could have been attributed to the Litchfield company or to the Duluth company or to both. In our opinion, the Litchfield company could be held responsible for the negligent condition in which the transformer was left whether the jury accepted plaintiffs' testimony that Froehle installed it or Froehle's testimony that a licensed electrician installed it. The Litchfield company must be charged with knowledge of the characteristics of the transformer in either case. If the company assumed the responsibility of installing, through its own employee, an instrumentality likely to cause harm if not installed properly, it impliedly professed to have the requisite skill and was bound to know the ordinary characteristics of the instrumentality.[4] If it engaged a skilled workman to install the instrumentality, it must also, in our opinion, be held bound to know the instrumentality's characteristics under the circumstances that could have been found to exist here. Those circumstances are that the Litchfield company attempted to have the neon sign installed in plaintiffs' place of business and residence as part of its promotion of the sale of Karlsbrau beer. Although it knew that the installation had not been properly completed, the Litchfield company nevertheless paid the electrician and assumed responsibility for completing the installation by having another sign delivered later and connected to the transformer. It failed, however, to deliver the other sign as promised or to otherwise correct the condition for which it had assumed responsibility. In all of these matters, and under either view as to who installed the trans-

[4]L. B. Laboratories, Inc. v. Mitchell (Cal.) 237 P. (2d) 84; Gill v. Middleton, 105 Mass. 477, 7 Am. R. 548; Van Nortwick v. Holbine, 62 Neb. 147, 86 N. W. 1057; Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, 23 L. R. A. 90; Price v. Ga Nun, 11 Misc. 74, 32 N. Y. S. 801; see, Steamboat New World v. King, 57 U. S. (16 How.) 469, 475, 14 L. ed. 1019, 1022; Cowles v. City of Minneapolis, 128 Minn. 452, 453, 151 N. W. 184, 185.

former, the evidence is undisputed that Froehle was acting within the scope of his authority.

Since the Litchfield company was aware, through its employee, of the condition in which the transformer was left and must be charged with knowledge of its characteristics in such condition, the company would be responsible for any negligence found to exist by virtue of the transformer having been left in that condition.

In view of our determination that the Litchfield company could be found negligent without having been notified of the first fire during the Christmas season of 1940, we find it unnecessary to pass upon the propriety of the trial court's striking from the record Mrs. Hippe's testimony that she talked to one of the Litchfield company's driver-salesmen about the transformer shortly after the 1940 fire.

■ We can find no basis, however, upon which the Duluth company could have been held liable for negligence even if the jury had found that the transformer was left in a negligent condition. There is nothing in the record to indicate that the Duluth company knew or was notified of the condition in which the transformer was left until after the fatal fire. Furthermore, the Litchfield company was not such an agent of the Duluth company for the purpose of installing the transformer and sign as to make the latter responsible for the misconduct of the former in making such installation. The essential basis of a principal's liability is his right to control his agent's physical conduct in carrying out the latter's work.[5] There was evidence that the Duluth company supplied the signs and transformers free of charge and told the Litchfield company to have them installed by an electrician or sign man and that the Duluth company reimbursed the Litchfield company for the expense of this particular installation. But there was no evidence that the arrangement between the two companies permitted the Duluth company to exercise any detailed control over the placement or manner of installing the devices. On the contrary, the Litchfield company

---

[5]Nicholas v. Hennepin Wheel Goods Co. 239 Minn. 269, 58 N. W. (2d) 572, and cases cited; 4 Dunnell, Dig. & Supp. § 5835.

obtained a lot of three signs and transformers from the Duluth company, and the latter apparently did not even know in which retail outlets they were to be placed. Moreover, there is nothing in the record to indicate that plaintiffs ever relied upon the Duluth company as a principal with respect to said installation. Under such circumstances it would be unreasonable to hold that the Duluth company could be found liable as a principal for the Litchfield company's negligence in failing to complete the installation and in leaving the transformer in the condition it did. Its liability cannot be based upon the mere fact that it reimbursed the Litchfield company for the expense of the installation and that it, along with the Litchfield company and plaintiffs, would benefit from the sign's advertisement of Karlsbrau beer. Insofar as the directed verdict applied to the Duluth company, we are of the opinion that it was proper, and the order appealed from, to that extent, must be affirmed.

■ One reason given by the trial court for its directed verdict was that "The evidence amounts to a guess as to how the fire started." This statement is apparently based upon Mr. Hippe's testimony that he could not say for sure whether he operated the switch which energized the transformer on the night the fire occurred. Defendants, in addition, challenge the sufficiency of the evidence to support a finding that the transformer could have caused the fire even if energized.

The record discloses that the switches for the transformer and the yard light were in a single wall plate and only an inch or two apart. Mrs. Hippe testified that at the time of the first fire, in 1940, she had operated the transformer switch by mistake in attempting to turn on the yard light. There was evidence that on other occasions a similar mistake had been made. Mr. Hippe testified that he did not know which of the two switches he operated the night of the fire before he went out into the yard. Moreover, the switches were accessible to anyone who came into the store-tavern that evening. In addition, both plaintiffs testified that, as the fire was discovered, they heard a crackling or buzzing noise which stopped

when Mrs. Hippe pulled the main electrical switch for the premises. They also testified that when they first saw the fire it was concentrated in an area around the transformer. Plaintiffs' expert witness testified that the current in the secondary wires had a high propensity to spark across a distance. He said that, after the transformer had been energized for some hours, the current could eat through tape and insulation and then spark. Mrs. Hippe testified that one of the wires was bent up within an inch of another part of itself, which was within the distance the expert testified the spark could jump.

In reviewing a directed verdict all inferences which may fairly be drawn from the evidence must be drawn in favor of the party against whom the verdict was directed. Although the evidence that the fire was proximately caused by the transformer's being energized and high voltage current sparking from the secondary wires is far from conclusive, we cannot say that a finding of proximate cause by the jury could not have been sustained on the evidence and the inferences that may properly be drawn from it.

Defendants contend that the fire might just as likely have been caused by defective wiring and that, where an injury might with equal probability have resulted from either of two causes, there is no reasonable basis to permit a jury to prefer one over the other. However, while there is evidence from which the jury could have found the transformer to have been a fire hazard, there is no evidence that the wiring was faulty. Defendants' statement that the wiring of the building in the vicinity of the transformer was inadequate for the voltage carried finds no support in the record. Accordingly, insofar as the directed verdict was based upon lack of proximate cause, it was in error.

■ Defendants contend that, in any event, plaintiffs were contributorily negligent and knowingly accepted the risk of any danger that might be found to have been created. Defendants point out that plaintiffs knew of the condition in which the transformer had been left but made no effort to disconnect or remove it or to have defendants disconnect or remove it. The trial court found the

record to be "loaded with evidence of contributory negligence on the part of the plaintiffs."

Plaintiffs themselves testified that they had discussions about the bare secondary wires becoming "hot," that is, charged with electricity, if the transformer were accidentally turned on and that they understood that the first fire, in 1940, had been caused by. Mrs. Hippe's mistake in operating the transformer switch. Mrs. Hippe testified that after being awakened on the night of the fire she immediately pulled the main electrical switch. Defendants cite these and other portions of testimony as establishing that plaintiffs appreciated that electricity might create a fire hazard. This court has said that judicial notice may be taken of the fact that we are living in an age in which the use of electricity has become so general and widespread in practically every community that the danger of electric energy is a matter of common knowledge among persons of ordinary intelligence and experience.[6] The evidence in the instant case, however, permits the conclusion that it was the peculiar propensities of the high voltage current produced by the transformer which created the grave danger. Neither common knowledge nor the evidence that plaintiffs knew in a general way the danger of ordinary electricity can charge them as a matter of law with knowledge of the nature of the current produced by a neon sign transformer. It must be remembered that we are concerned here with an appliance operating on ordinary house current and not with outdoor power transmission lines such as were involved in the cases cited in footnote 6.

Defendants, however, contend further that the first fire, in 1940, put plaintiffs on notice that the current produced by the transformer created a fire hazard even though they may not have been aware of the technical nature of the current. Defendants suggest many steps that plaintiffs could reasonably have taken to protect against a further fire:

---

[6]Beery v. Northern States Power Co. 239 Minn. 48, 57 N. W. (2d) 838; Peterson v. Minnesota Power & Light Co. 206 Minn. 268, 288 N. W. 588.

"* * * disconnecting the service wires from the low side of the transformer; disconnecting the service wire from the energizing switch, or fastening down the switch lever with tape, or removing the high tension wires from the high side of the transformer."

But the situation might also have suggested other steps, including covering the bare wires with tape and bending them up out of the way and removing such highly inflammable materials as crepe paper from the vicinity, which are the steps plaintiffs actually took. Whether taking these latter steps alone of the many available was an exercise of due care by plaintiffs in light of what they knew or should have known about the dangers of the device is, in our opinion, clearly a question for the jury. The jury could properly have found that plaintiffs' actions were reasonable under the circumstances.

Here, as in all other cases where we have held that plaintiff's evidence made out a question of liability for the jury, we make no suggestion as to what result a jury should reach on the evidence presented, nor do we intimate any opinion as to what disposition should be made of the case after defendant has offered its proof and both parties have rested. But we hold that on the record before us it was error for the trial court to have directed a verdict in favor of defendant Litchfield company.

For the reasons previously stated, the order appealed from should be affirmed as to defendant Duluth Brewing & Malting Company and reversed as to defendant Litchfield Produce Company.

So ordered.

Mr. Justice Nelson, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.