## SHOEMAKER ET AL. v. KINGSBURY.

1. When contractors for building a railroad, running a construction train, consent to take a passenger for hire on their train, they are private carriers for hire, and are only bound to exercise such care and skill in the management and running of the train as prudent and cautious men, experienced in that business, are accustomed to use under similar circumstances.

2. The passenger in such case takes upon himself the risks incident to the mode of conveyance.

3. Where an accident occurs to a passenger carried on such a train, by the car in which he was carried being thrown off the track, the contractors are not responsible, unless the accident is directly attributable to their negligence or unskilfulness in that particular; that is to say, in the management and running of the train. Accordingly, an instruction that it is incumbent on the defendants to prove that the agents and servants in charge of the train were persons of competent skill, *of good habits*, and in every respect qualified and suitably prepared for the business in which they were engaged, and that they acted on this occasion with reasonable skill, and with the utmost prudence and caution, was held erroneous, in that it turned the attention of the jury from the question at issue for their determination, and directed it to the skill, habits, and attainments for their business of the agents and servants of the defendants, as well as to their conduct on the occasion of the accident.

ERROR to the Circuit Court for the District of Kansas.

Suit for damages for personal injuries happening on a rail car; the case being thus:

In 1867, Shoemaker and another were contractors for building the Eastern Division of the Union Pacific Railway in Kansas; and in October of that year they ran a construction train over a portion of the road, carrying material for it. To this train was attached what was called a "caboose car"—a car for the accommodation of the men connected with the train, who had their "sleeping bunks" in this car, and who stored their tools there, as also the lamps used on the cars. The road was not yet delivered over to the Pacific Railway Company, and the contractors did not wish to carry passengers. Persons, however, were sometimes carried on the caboose car, and sometimes fare had been charged for their passage, but not always.

In this state of things, one Kingsbury, a sheriff in Kansas, and a deputy marshal, wanted to make an arrest on the line of the road, and he applied for passage as far as to a place called Wilson's Creek, asking the conductor to stop the train there, in order that he might make the arrest. He was accordingly taken on the train, and the train stopped until he had made the arrest.

A part of the fare charged was paid by Kingsbury on the cars, and the balance afterwards. The train ran from Ellsworth to Walker's Creek in Kansas. In going towards Walker's Creek the train was made up and ran in the usual way of making up and running railway trains, the engine being in front, with the caboose and flat-cars attached in regular order. But on the return from Walker's Creek, as there was, as yet, no turntable on the road, the usual order for making up such trains was reversed, and both engine and tender were backed over the road, a distance of more than fifty miles: the tender being ahead, the engine next, the caboose and other cars attached, and following in regular order. When about three miles from Ellsworth, on this return trip, both the engine and tender were thrown from the track and upset. At the time this accident occurred, Kingsbury was riding in the caboose car with the conductor of the train, and either jumped out or was thrown out, which of the two did not exactly appear. Whichever of the two things was true he was hurt, and for the injuries which he received he brought the action below.

The accident was occasioned by the engine running against a young ox, which leaped on to the track about twenty feet in front of the advancing train, from grass or weeds five or six feet high, growing on the sides of the road. The train was running at its usual rate of speed. The accident occurred just after dark; but it was a moonlight night, and the engineer testified that he could have seen an animal two hundred yards distant on the track; that the animal was only about twenty feet from the engine when first seen. He continued his testimony thus:

"As soon as I saw the animal I shut off the steam, and seized

the lever to reverse the engine, and had it about half over when the engine went off the track. Something struck me on the head and I did not know anything more. I was injured. I did what I thought was best to be done to stop the train. The whistle lever was in the top of the cab. I did not whistle for brakes. I had no time to do so after I saw the animal and before the engine went off the track. The train could have been stopped in about one hundred and fifty yards. When danger appears, the first thing to be done is to reverse the engine and then sound the whistle for brakes. Both could not be done at the same time. In order to reverse and blow the whistle two motions are necessary—first, to cut off the steam, and then take hold of the lever to throttle valve and move it over. It takes both hands to reverse. The whistle is sounded by a lever in the top of the cab. Brakemen would know, by shutting off steam and reversing, that something was the matter. It would take about ten seconds to do all this. I did it as quick as I could. I could have done nothing more than I did do."

There was no fence on the sides of the road. The plaintiff had been several times before over the road and knew its condition, and the manner in which the trains were made up and run.

The court, among other instructions, gave the following as a fifth to the jury, to which the defendants excepted:

"*When it is proved that the car was thrown from the track, and the plaintiff injured, it is incumbent on the defendants to prove that the agents and servants in charge of the train were persons of competent skill,* OF GOOD HABITS, *and in every respect qualified and suitably prepared for the business in which they were engaged,* AND *that they acted on this occasion with reasonable skill, and with the utmost prudence and caution; and if the disaster in question was occasioned by the least negligence, or want of skill or prudence on their part, then the defendants are liable in this action.*"

There was no evidence in the case in relation to the skill, habits, or qualifications of the agents and servants of the defendants, except what arose from the fact that the engineer had been employed on a railroad about four years, and had been engineer for more than two years, and that the fireman had been on a railroad for about eighteen months.

Verdict and judgment having gone for the plaintiff, the defendants brought the case here on error.

*Messrs. A. P. Usher and William T. Otto, for the plaintiffs in error:*

Even if these two defendants, contractors only for building the Union Pacific Railroad, had been general carriers of passengers for hire—and "common carriers" of freight and baggage—had been, in short, the Union Pacific Railroad Company itself—and offering, like railroad companies generally, to carry everybody who applied to them to be carried, and all freight and baggage offered—the first part of the instruction—the part italicized and ending with the words, "were engaged"—would have been erroneous. The instruction must be taken in reference to the facts of *this* case. The question was one of foresight, care, and skill. None other can arise in the case even of general carriers of passengers. Their obligation is distinguished from that of "common carriers" or general carriers of *goods* for hire. This distinction is universally received,[*] and the question is always one as to the application of this rule under the special sort of carriage, as whether by horse coaches or rail cars, sailing vessels or steamers; the case in regard to all vehicles impelled by steam, being, of course, vastly different, we admit, in application from those impelled by feeble agents.

In *Boyce* -v. *Anderson*,[†] this court, Marshall, C. J., delivering its judgment, decides "that the doctrine of common carriers does not apply to the carrying of intelligent beings:"

"The carrier," says the Chief Justice, thus speaking, "is undoubtedly answerable for any injury sustained in consequence of his negligence or want of skill, but we have never understood that he is responsible further."

And a judgment below, given on an instruction that the carriers were "responsible for negligence or unskilful conduct, but not otherwise," was affirmed. A similar view is taken in *Stokes* v. *Saltonstall*.[‡]

---

[*] See 1 Smith's Leading Cases, 6th edition, note to Coggs *v.* Bernard.
[†] 2 Peters, 150.                   [‡] 13 Id. 191.

The question was then one of nothing but foresight, care, and skill, and the instruction must be taken in reference to the case. No want of either foresight, care, or skill was attempted to be inferred, by showing want of good habits— the court probably meaning by the words, want of ebriety— though the words go far beyond the matter of ebriety, and may have been naturally understood by the jury as doing so. How, then, is the matter of the "good habits" of the company's servants properly brought into issue? If the car was thrown from the track by an inevitable accident, how could the defendants be made liable, even if the "habits" of their servants were not "good?" If it was thrown from it by a specific act of negligence, what would "habits" even the most exemplary avail as a defence? The court had no right to require evidence of the defendants on this subject. Assuming that which we deny, to wit, that the defendants were general carriers of passengers, the instruction ought to have been, "Did they, taking into account the mode of transportation, provide, as far as human care and foresight could go, for the safety of the plaintiff? And did their servants in charge of the train exercise the highest degree of skill and judgment on the occasion of the accident? Was the accident solely their fault, or was it unavoidable?" The affirmative of all these issues was upon the plaintiff. But the instruction disposed of all consideration as to the cause of the accident, and declares the defendants in fault from the fact of it.

But the defendants were not general carriers of passengers any more than they were "common carriers" of goods. They were but contractors to build a road. Carriage of any body or any thing was neither their principal and direct business nor an occasional and incidental employment. For the purpose of building the road, they had a "caboose car," and having occasion to go forward and back themselves, for a short time before delivering the road to the Union Pacific Railroad Company, whose road it was, they let the defendant ride on it. That was all. If they took reasonable care, under the circumstances—which included going through a

dreary, uninhabited wilderness, tender going foremost, engine moving backwards, it was enough. The rule which the court applied in the second part of its charge was not applicable to *such* carriers. They were not bound to the "*utmost* prudence and caution," and liable for the "*least* negligence or want of skill," however much general carriers of passengers, sometimes in ordinary parlance called "common carriers of passengers," may be.

Moreover, in this case,—even had the carriers been general carriers,—the instruction, in the way in which it was given, was calculated, like all the rest of the instructions, to mislead; and the jury would have found for the plaintiff, though the accident had been caused wholly by his own fault.

The instruction, in short, was wrong from beginning to end.

*Messrs. George Earle and G. W. Paschall, contra:*

The defendants did make the carriage of passengers an occasional and incidental employment. That is enough to constitute them general carriers of passengers, for in the case of goods it would make the party a "common carrier."[*] The latter part of the instruction was right.

Then, as to the first part. It does not indeed follow, even as a *primâ facie* inference, because a man who has just been in a rail car is found greatly hurt, that the railroad company is responsible for his injury. The injury may have been caused by his own act, and if the car is in its right place and everything regular, the presumption would be that it was so caused. But when you show that the car is *off the track*, that the train had been running, tender first, engine hind-part before, and everything *topsy-turvy*, and that a man is hurt, you raise every presumption against the company; and they are bound to show just what the court below said they were. When you show an engineer running through his whole route with a train stern foremost, the operation followed by running on an ox, and this followed by a de-

---

[*] See 1 Smith's Leading Cases; note to Coggs *v.* Bernard.

*raillement* and injury to a passenger, you raise a question of sobriety; for, *primâ facie*, no engineer if sober would so run. The instruction was in exact conformity with the law as decided by this court in *Stokes* v. *Saltonstall,* cited on the other side.

*Reply:* In *Stokes* v. *Saltonstall*—the case of an injury by upsetting a stage coach—it was testified that the driver was grossly intoxicated; and the instructing of the jury here, in the language of that case, shows the danger of applying what was said in one state of facts, to another state, that has no resemblance to it.

Mr. Justice FIELD delivered the opinion of the court.

From the whole evidence in this case it is plain that the defendants were not common carriers of passengers at the time the accident occurred, which has led to the present action. They were merely contractors for building the Eastern Division of the Union Pacific Railway, and were running a construction train to transport material for the road. The entire train consisted, besides the engine and its tender, of cars for such material and what is called in the testimony a "caboose car." This latter car was intended solely for the accommodation of the men connected with the train: it contained their bunks and mattresses; they slept in it, and deposited in it the lamps of the cars, and the tools they used. It was not adapted for passengers, and, according to the testimony of the conductor, the defendants did not wish to carry passengers, although when persons got on to ride the defendants did not put them off, and sometimes, though not always, fare was charged for their carriage.

The plaintiff, who was sheriff of a county in Kansas, and deputy marshal of the district, desired to arrest a person on the line of the road, and, to enable him to accomplish this purpose, he applied to the conductor for passage on the train as far as Wilson's Creek, and requested that the train would stop there until the arrest could be made. His wishes were granted in both respects, and for the services rendered he

paid at the time a portion of the fare charged, and the balance subsequently.

In the rendition of these services for the plaintiff, the defendants were simply private carriers for hire. As such carriers, having only a construction train, they were not under the same obligations and responsibilities which attach to common carriers of passengers by railway. The latter undertake, for hire, to carry all persons indifferently who apply for passage, and the law, for the protection of travellers, subjects such carriers to a very strict responsibility. It imposes upon them the duty of providing for the safe conveyance of passengers, so far as that is practicable by the exercise of human care and foresight. They are bound to see that the road is in good order; that the engines are properly constructed and furnished; that the cars are strong and fitted for the accommodation of passengers, and that the running gear is, so far as the closest scrutiny can detect, perfect in its character. If any injury results from a defect in any of these particulars they are liable.

They are also bound to provide careful and skilful servants, competent in every respect for the positions to which they are assigned in the management and running of the cars; and they are responsible for the consequences of any negligence or want of skill on the part of such servants.

They are also bound to take all necessary precautions to keep obstructions from the track of the road; and, although it may not be obligatory upon them, in the absence of legislative enactment, to fence in the road so as to exclude cattle, it is incumbent upon them to use all practical means to prevent the possibility of obstruction from the straying of cattle on to the track as well as from any other cause. As said by the Supreme Court of Pennsylvania, in speaking of the duty of railway companies in this particular:* "Having undertaken to carry safely, and holding themselves out to the world as able to do so, they are not to suffer cows to endanger the life of a passenger any more than a defective

* Sullivan *v.* Philadelphia and Reading Railroad Company, 30 Pennsylvania State, 234.

rail or axle. Whether they maintain an armed police at cross-roads, as is done by similar companies in Europe, or fence, or place cattle-guards within the bed of their road, or by any other contrivance exclude this risk, is for themselves to consider and determine. We do not say they are bound to do the one or the other, but if, by some means, they do not exclude the risk, they are bound to respond in damages when injury accrues."

It is evident that the defendants in this case were not subject to any such stringent obligations and responsibilities as are here mentioned. They did not hold themselves out as capable of carrying passengers safely; they had no arrangements for passenger service, and they were not required to make provisions for the protection of the road such as are usually adopted and exacted of railroad companies. They did not own the road, and had no interest in it beyond its construction. It was no part of their duty to fence it in or to cut away the bushes or weeds growing on its sides.

The plaintiff knew its condition and the relation of the defendants to it when he applied for passage. He had been previously over it several times, and was well aware that there were no turntables on a portion of the route; a fact, which compelled the defendants to reverse the engine on the return of the train from Walker's Creek. He, therefore, took upon himself the risks incident to the mode of conveyance used by the defendants when he entered their cars. All that he could exact from them, under these circumstances, was the exercise of such care and skill in the management and running of the train as prudent and cautious men, experienced in that business, are accustomed to use under similar circumstances. Such care implies a watchful attention to the working of the engine, the movement of the cars and their running gear, and a constant and vigilant lookout for the condition of the road in advance of the train. If such care and skill were used by the defendants, they discharged their entire duty to the plaintiff, and if an accident, notwithstanding, occurred, by which he was injured, they were not liable. They were not insurers of his

safety, nor responsible for the consequences of unavoidable accident.

The question should have been put to the jury whether the defendants did in fact exercise such care and skill in the management and running of the train at the time the accident occurred. They were not responsible to the plaintiff, unless the accident was directly attributable to their negligence or unskilfulness in that particular.

The evidence in the case shows that the accident was occasioned by the tender and engine running against a steer. The train was proceeding at its usual rate of speed when the steer suddenly, from a mass of high weeds or grass growing on the sides of the road, leaped upon the track directly in front of the advancing train, at a distance from it of about twenty feet. This distance was so short, and the movement of the animal was so sudden, that it was impossible to arrest the train, and a collision followed which threw the engine and tender from the track. The plaintiff, on the happening of the collision, either leaped from the " caboose car," in which he was at the time sitting, or was thrown from it, it is immaterial which, and was injured.

The fifth instruction given by the court turned the attention of the jury from the simple question at issue for their determination, and directed it to the skill, habits, and attainments for their business of the agents and servants of the defendants, as well as to their conduct on the occasion of the accident. It held proof that the agents and servants were possessed of competent skill, of good habits, and in every respect qualified and suitably prepared for the business in which they were engaged, as essential as proof that they acted on the occasion with skill, prudence, and caution. And it made the occurrence of the accident presumptive evidence that they were destitute of such skill, habits, and qualifications.

We are of opinion that the court erred in this instruction, and that it misled the jury. On this ground the judgment of the court below must be

REVERSED AND THE CAUSE REMANDED FOR A NEW TRIAL.