DAYTON COAL & IRON CO., Limited, v. DODD.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1911.)

No. 2,066.

1. Executors and Administrators (§ 29*)—Appointment—Jurisdiction of Court.

Where a court has general jurisdiction over the appointment of administrators, every possible intendment will be given effect in support of an appointment, and only jurisdictional defects appearing on the face of the record can be attacked collaterally.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 178–182; Dec. Dig. § 29.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. EXECUTORS AND ADMINISTRATORS (§ 20\*)—APPOINTMENT—JURISDICTION OF COURT.**

Shannon's Code Tenn. § 6023, provides that the county court shall have its regular sessions on the first Monday of each month, and the court shall sit from day to day so long as the business thereof may require. An order appointing an administrator recited that "a quorum court was opened and held * * * on the 2d day of July, 1907, when the following business was had and entered of record." *Held*, that the order was not to be construed as stating that the regular session of the court was begun on that day, and that it did not show lack of jurisdiction to make the order.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 20.\*]

**3. MASTER AND SERVANT (§ 191\*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—FELLOW SERVANT.**

It is the rule in the federal courts that an employer is not liable for an injury to an employé occasioned by the negligence of another employé engaged in the same general undertaking; both performing duties tending to accomplish the same general purpose, although they may be in different departments.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 475–479; Dec. Dig. § 191.\*]

**4. MASTER AND SERVANT (§ 194\*)— MASTER'S LIABILITY FOR INJURY TO SERVANT—FELLOW SERVANTS—EMPLOYÉS BEING CARRIED TO AND FROM WORK.**

Employés, while being carried free by the employer as a part of their contract of service to and from their place of work, are fellow servants of other employés, and not passengers, and it is immaterial that the carriage is after the hours of work or under an implied term of the contract of employment giving the employé the privilege of riding at his option, but not requiring it as a necessary part of the service.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 383, 384; Dec. Dig. § 194.\*

Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

**5. MASTER AND SERVANT (§ 194\*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—FELLOW SERVANTS.**

Defendant operated iron furnaces, and also coal mines and coke ovens some three miles from its plant, to which the coal and coke were transported by means of a private railroad. Plaintiff's intestate was a coal miner in defendant's employ. The most of the miners resided at a distance from the mine on the line of railroad and were given the privilege of riding free, in coal and coke cars, on defendant's trains to and from their work if they desired. While plaintiff's intestate was so riding to his home, with other miners, after completing his day's work, cars which had been standing on a branch track were permitted to run onto the main track causing a collision in which he and others were killed. *Held*, that deceased was not a passenger at the time, but his relation to defendant was that of an employé', and that there could be no recovery for his death on the ground that it was caused by the negligence of other employés in handling the standing cars; they being his fellow servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 383, 384; Dec. Dig. § 194.\*]

**6. MASTER AND SERVANT (§ 286\*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.**

Plaintiff's intestate, an employé of defendant, while riding from his work on one of defendant's trains, was killed in a collision with runaway cars which escaped from a branch track upon the main track. Defendant had installed a derailing switch on the branch to prevent such escape, which had been used until a few days prior to the collision, when

---

a new head brakeman had been employed, and there was evidence that he had not been instructed as to its use. *Held*, that the question of defendant's liability for failing in its duty as master to give such instructions was properly submitted to the jury.

[Ed. Note.- For other cases, see Master and Servant, Cent. Dig. §§ 1044–1050; Dec. Dig. § 286.*]

7. MASTER AND SERVANT (§§ 293, 295*)—ACTION FOR INJURY TO SERVANT—IN-STRUCTIONS.

Instructions considered and approved in an action against a master for the death of an employé while riding on a train on a private railroad operated by defendant; such instructions relating to the care required of defendant and the assumption of risk by the deceased.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1148–1161, 1168–1171; Dec. Dig. §§ 293, 295.*]

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

Action at law by J. J. Dodd, administrator of Elijah Huff, deceased, against the Dayton Coal & Iron Company, Limited. Judgment for plaintiff, and defendant brings error. Reversed.

W. B. Miller and Paxton, Warrington & Seasongood, for plaintiff in error.

Fostor V. Brown, Frank Spurlock, and Joe Brown, for defendant in error.

Before SEVERENS and KNAPPEN, Circuit Judges, and SATER, District Judge.

KNAPPEN, Circuit Judge. The writ of error is brought in this case to review a judgment in favor of defendant in error for personal injuries to plaintiff's intestate, resulting in death. The prominent facts are these:

The plaintiff in error (hereinafter called the defendant) was at the time of the accident engaged in operating a furnace at Dayton, Tenn., for the manufacture of pig iron, purchasing the ore used for that purpose, also maintaining coal mines and coke ovens about three miles from Dayton, together with a small railroad system, consisting of a line from the Dayton yards to the coal mines, and another, about two miles long, from the Dayton yards to the river, and connecting with traffic thereon. There was also connection at Dayton with the tracks of the Cincinnati Southern Railway. The operating of the furnaces (which was the principal business), the railroad, the mines, and coke ovens (coke being required in the manufacture of pig iron), constituted one business, over which there was a general superintendent; there being also a yardmaster, or foreman of the railroad department. The train running between Dayton and the mines was manned by a locomotive engineer, a fireman, a head brakeman, and an assistant brakeman; there being no conductor. The business of this railroad was largely the hauling of coal and coke from the mines to Dayton, and the hauling of empty coal and coke cars, as well as supplies of various kinds, from Dayton to the mines and ovens. Day and night train shifts were maintained. The first train which left Dayton at 6 o'clock in the morning, and was the first run of the day shift, was called the

"miners' train." It consisted largely of empty coal and coke cars to be filled at the mines and ovens, and in which coal and coke cars the miners rode to the mines; supplies being sometimes carried in the train. The company had houses at Dayton, Morgantown, and elsewhere along the railroad, which it rented to its employés. Some of the latter, including deceased, did not rent company houses. The greater part of the miners lived at Dayton and at Morgantown; the latter being a mile or less from the mines. The miners were allowed to ride on this train free, and most of them did so ride; the wages being the same whether they rode or not. They were not, however, required to ride.

The whistle was blown at Dayton as a notice to the miners that the train was about to start. Those living at Morgantown took the train at a certain customary meeting point. At about 4:30 in the afternoon, after the last blast, the miners took the train at Hanging Rock for the return home; that run being the last made by the day shift, and this return train consisting largely, but not always exclusively, of empty coal and coke cars. The miners had nothing to do with either the operation of the morning or the evening train; their actual work having ended when the last blast was fired. The railroad was entirely a private road, and did no commercial business whatever. It carried no passengers, unless the miners are to be regarded such. No passenger cars were carried. From a point at or near Hanging Rock on the main track (where the miners left the train), a spur or tail track, about 300 feet in length, extended to the coal tipple. This tail track had been extended several months before the accident, and in connection therewith a derailing switch put in, in order to throw off the track any runaway car which might escape from the vicinity of the tipple, and thus prevent the car running upon the main track. Until a few weeks before the accident in question it had been customary to operate the derailing switch in connection with trains passing over it. A few weeks before the accident, however, a new head brakeman was installed. He was not instructed to use the derailing switch, and did not make a practice of doing so during his employment, which covered the time of the accident to the deceased. On the evening in question the train brought in from Dayton two cars (one fully, the other partly, loaded) which it left at the coal tipple, in connection with a third car standing thereat. On leaving these cars the train passed over the tail track and onto the main track; the derailing switch not having been set after the passage of the train. The miners (between 200 and 400) boarded the train at Hanging Rock. A few minutes after the train left, the stable boss at the mines, who was also engaged that day in loading coal cars, in company with another employé, pinched two of the cars at the tipple apart from the third, in order to make room for the passage of the mules between the mines and the stables, with the result that the two cars referred to became unmanageable and ran away down the incline of the tail track and upon the main track, overtaking and colliding with the miners' train, killing the plaintiff's intestate and several others. Had the derailing switch been set, the accident could not have happened. The plaintiff

relied upon several grounds of negligence, not necessary to be here stated in addition to those submitted to the jury. Upon the trial the defendant contended that the relation between defendant and deceased was that of master and servant. The plaintiff contended that the defendant's relation was that of a carrier of passengers. The trial court held that the defendant was, as concerned the deceased, not a common carrier of passengers, but a private carrier, bound only to "exercise such a degree of care and skill in the management and running of its train as a prudent, cautious man, experienced in the business would be expected to use under the circumstances; that is to say, in reference to the means of transportation employed and the character of the train being operated." The court submitted to the jury three alleged grounds of negligence: First, the failure of the defendant's superior officers or agents to "instruct the brakeman in reference to the use or operation of the derailing switch; that is, the alleged failure to see that the use of that derailing switch was kept up by the train crew." Second, the alleged negligence of the head brakeman in failing to set the derailing switch. And, third, the alleged negligence of the employés in so handling the cars at the tipple as to permit them to run away and collide with the miners' train. At the close of the testimony the defendant moved for peremptory instruction, which was denied.

. 1. A preliminary question arises over the authority of the administrator appointed by the county court of Rhea county, Tenn. Section 6023 of Shannon's Code of Tennessee provides that:

"The county court to be held by the county judge, shall have its regular sessions on the first Monday of each month."

The order appointing the administrator was made on July 2, 1907. The caption of the order of appointment is as follows:

"Be it remembered that a quorum court was opened and held for Rhea county, at the courthouse in the city of Dayton, Tennessee, on the 2d day of July, 1907, * * * when the following business was had and entered of record."

[1] It seems to be conceded that the 2d of July, 1907, was Tuesday, and it is urged that the order thus shows upon its face a lack of jurisdiction. The section of the Code above quoted contains, however, this provision:

"And the court shall sit from day to day so long as the business thereof may require."

The county court being one of general jurisdiction over the appointment of administrators, all possible intendments will be made in support of the order of appointment, and only jurisdictional defects appearing on the face of the record can be attacked collaterally. Brien v. Hart, 6 Humph. (Tenn.) 131; State v. Anderson, 16 Lea (Tenn.) 321; Curtis v. Charlevoix County Supervisors, 154 Mich. 646, 656, 118 N. W. 618.

[2] To exclude an intendment that the regular session was opened on Monday, July 1st, and continued on Tuesday, July 2d, as the statute permits, it is necessary to construe the language "a quorum court

was opened and held" as if it read "a regular session of the quorum court was begun and opened"; for only thus would the lack of jurisdiction appear upon the face of the record. It is clear, to our minds, that the language of the order should not be so construed, and that lack of jurisdiction does not appear upon the face of the order.

[3] 2. The fundamental question presented is whether the relation of the deceased to the defendant, while on the train in question, was that of a passenger or servant. This question gains special importance from the fact that two of the grounds of liability submitted to the jury relate to negligence of employés of defendant who, it is insisted, were fellow servants of the deceased; it being the settled rule in the federal courts that an employer is not liable for an injury to an employé occasioned by the negligence of another employé engaged in the same general undertaking, and that it is not necessary to the application of this rule that the employés should be engaged in the same operation or particular work; it being sufficient if the two are in the employment of the same master and engaged in the same common enterprise, both performing duties tending to accomplish the same general purpose, although they may be in different departments. Steamship Co. v. Merchant, 133 U. S. 375, 10 Sup. Ct. 397, 33 L. Ed. 656; Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983, 38 L. Ed. 1009; Railroad Co. v. Conroy, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181; Louisville & N. Ry. Co. v. Stuber (Sixth Circuit) 108 Fed. 934, 938, 48 C. C. A. 149, 54 L. R. A. 696; Illinois Central R. Co. v. Hart (Sixth Circuit) 176 Fed. 245, 247, 100 C. C. A. 49. That defendant was not a commercial carrier, or a carrier of passengers for hire, is clear; and the Circuit Court was right in so holding. Taenzer v. C., R. I. & P. R. Co., 170 Fed. 240, 95 C. C. A. 436; Dayton v. Coal & Iron Co., 99 Tenn. 578, 42 S. W. 444. The specific question is whether the defendant's relation to deceased was that of a private carrier, or whether the riding of the deceased on the train in question from the mine to his home was an incident of the employment, to the extent that the relation of employer and employé continued during such carriage.

[4] The general rule is, in our opinion, settled by the weight of authority that employés, while being carried as part of their contract of service to and from their place of work, are fellow servants and not passengers. This is the general rule even as to railway employés, and the application of this rule does not necessarily fail from the mere fact that the carriage is had after the day's work has ceased. Nor is it necessary that the agreement for such carriage be expressed. It is sufficient if it be an implied term of the contract of employment, or contemplated thereby, as an incident thereof and a privilege connected therewith, for the sole purpose of facilitating the work of the employer and the employé. Nor is the mere fact that it is not necessary that the employé ride upon the train controlling of his status as employé. This rule is supported by a long line of authorities, including the following: Gillshannon v. Railroad, 10 Cush. (Mass.) 228; Seaver v. Boston & Maine R. Co., 14 Gray (Mass.) 466; Gilman v. Eastern Railroad Corporation, 10 Allen (Mass.) 233, 87 Am.

Dec. 635; McGuirk v. Shattuck, 160 Mass. 45, 35 N. E. 110, 39 Am. St. Rep. 454; Kilduff v. Boston Elev. Ry. Co., 195 Mass. 307, 81 N. E. 191, 9 L. R. A. (N. S.) 873; Kansas Pacific Ry. Co. v. Salmon, 11 Kan. 83; Bowles v. Indiana Ry. Co., 27 Ind. App. 672, 62 N. E. 94, 87 Am. St. Rep. 279; Iommone v. N. Y., N. H. & H. R. R. Co., 21 R. I. 452, 44 Atl. 592, 46 L. R. A. 730, 79 Am. St. Rep. 812; Vick v. N. Y. C. & H. R. R. Co., 95 N. Y. 267, 274, 47 Am. Rep. 36; Cicalese v. Lehigh Valley R. Co., 75 N. J. Law, 897, 900, 69 Atl. 166; Wright v. Railroad, 122 N. C. 852, 29 S. E. 100; Roland v. Tift, 131 Ga. 683, 63 S. E. 133, 20 L. R. A. (N. S.) 354; Tunney v. Midland Ry. Co., L. R. 1 C. P. 291; Cremins v. Guest, etc., Ltd., L. R. 1 K. B. Div. 469; Gane v. Colliery Co., L. R. 2 K. B. Div. 539; Birmingham Ry., etc., Co. v. Sawyer, 156 Ala. 199, 47 South. 67.

In Gillshannon v. Railroad, a common laborer on a railroad, while riding on a gravel train to his place of labor, was injured by a collision. It was held that the relation of master and servant existed between the plaintiff and the railroad company; the court saying:

"If the plaintiff was by the contract of service to be carried by the defendants to the place for his labor, then the injury was received while engaged in the service for which he was employed. * * * If it be not properly inferable from evidence that the contract between the parties actually embraced this transportation to the place of labor, it leaves the case to stand as a permissive privilege granted to the plaintiff, of which he availed himself, to facilitate his labors and service, and is equally connected with it, and the relation of master and servant, and therefore furnishes no ground for maintaining this action."

In Seaver v. Boston & Maine R. Co., a carpenter employed by the day by a railroad corporation to work on the line of its road, and carried on its cars to the place of such work without any fare, was held not entitled to maintain an action against the corporation for injuries occasioned to him, while being so carried, by the negligence of those managing the train or charged with the duty of keeping in repair the equipment of the train.

In Gilman v. Eastern Railroad Corporation, where the railroad company was held not responsible to a person employed by it to repair its cars for a personal injury arising from the negligence of a switchman upon a track over which he is carried by the company free of charge, between his home and the place of his work, Justice Gray, speaking of the Gillshannon and Seaver Cases, said:

"In each of those two, as in this, the plaintiff's work did not begin until his arrival at his destination; and in this, as in those, the work was upon the structures, means, or instruments with which the defendants were to carry on their business of common carriers, the workman paid nothing for his passage, and the object of the defendants in carrying him was to get him to his place of work."

In McGuirk v. Shattuck, a woman who was employed by a person as a laundress, and who was being conveyed either gratuitously or as a part of a contract of employment, from her home to that of her employer in his wagon, was held to be in the service of the employer.

In Kilduff v. Boston Elev. Ry. Co., a workman employed by a street railway company as a laborer in the construction of a new line of track was killed while being transported with other workmen back from the place of work after his day's work was finished. Mr. Justice Morton said:

"Although at the time of the accident the plaintiff's intestate had finished his work for the day, and he was under no obligation to do any more work for the defendant on that day, it seems to us plain that he was being transported by the defendant as an incident of his employment, and that the relation between him and the defendant was therefore that of master and servant and not that of carrier and passenger. The car was a special car in which only the laborers who were working on that particular job were allowed to ride, and was furnished for the mutual accommodation of the company and the laborers, and the plaintiff's intestate paid no fare. The portion of the track where the accident occurred was not open to the public, and transportation over that and the rest of the route was plainly furnished by the defendant to the deceased as a laborer in its employment and not as a passenger. It cannot reasonably be referred to any other relation."

In Ionnone v. N. Y., N. H. & H. R. Co., where an employé of the defendant railroad company upon the completion of his work was invited to ride in the defendant's car to a point near his home, the carriage being gratuitous, it was said:

"The carrying of the deceased, after his day's work was done, to a point near his home, is, we think, to be regarded not as creating the relation of a passenger, but rather as a privilege incidental to his contract of service, granted to him by the defendant, of which he availed himself to facilitate his return to his home, and that it was a privilege accorded to him merely by reason of his contract of service."

In Bowles v. Indiana Ry. Co., it is said:

"The general rule may be said to be that, where an employé is being carried by his employer in the conveyance of the latter to and from the work for which the former is employed, he is regarded not as a passenger, but as an employé; though if he is being carried merely for his own convenience, pleasure, or business, he is a passenger."

In Kansas Pacific Ry. Co. v. Salmon, the rule of master and servant was applied to the case of a person in the employ of the railroad company riding from his nome to his employment in the caboose car attached to a freight train, without paying fare, according to the custom and understanding of the parties, from which cars and trains all persons except the employés of the company were excluded.

In Wright v. Railroad Co., the rule was applied to the case of a section master, who, after his day's work, rode on a train to his lodging place without paying or being expected to pay his fare. In all or nearly all of the cases we have thus far cited, one or more of the Massachusetts cases referred to are cited with approval.

In Birmingham Ry. Co. v. Sawyer, it was held that a section hand, injured while riding back and forth to work on a car, without charge, pursuant to a rule of the company, is not a passenger, but is in the exercise of a mere privilege connected with his employment.

In Tunney v. Midland Ry. Co., the rule was applied to the case of a laborer employed by a railway company to assist in loading a "pickup train" with materials left by plate layers and others upon the line;

one of the terms of his employment being that he should be carried from his home to the place at which his work for the day was to be done by the train, and to be brought back to his home at the end of each day.

Cremins v. Guest, etc., Ltd., and Gane v. Colliery Company, involved awards under the workmen's compensation act, and in both the question whether plaintiff was in the course of his employment was involved. The Cremins Case turned upon an implied agreement with the colliery company that he should have the right to travel between his home and the colliery free of charge. In the Gane Case, among the acts enumerated as within the contract of employment, was "taking a train, which he (the collier) is entitled to use by virtue of his contract of service."

The Supreme Court of the United States has not passed upon the specific question involved here, although some of its decisions have more or less bearing thereon.

In Martin v. Atchison, T. & S. F. R. Co., 166 U. S. 399, 17 Sup. Ct. 603, 41 L. Ed. 1051, the fellow-servant rule was applied to the case of a common laborer who was injured by being run into by a train while on a hand car on the road proceeding to his place of work.

In Texas & Pacific Ry. Co. v. Bourman, 212 U. S. 536, 29 Sup. Ct. 319, 53 L. Ed. 641, the fellow-servant rule was applied to a section hand who, after being engaged in clearing up a wreck, was taken aboard an express train to be conveyed to the station at which he lived, and being injured while on the train by the alleged negligence of the engineer of the train and his own foreman.

In 4 Elliott on Railroads, § 1578a, it is said:

"As to whether an employé riding on a train is a passenger there is some conflict; but the rule seems to be that if he is being carried to and from his working place he is not a passenger, but if he is carried for his own convenience or business he is a passenger."

See, also, Labatt on Master & Servant, § 624.

Several cases are cited in support of the contention that the deceased occupied the relation of passenger. All but one of these cases are distinguishable in their facts from the case presented here, and nearly all are reconcilable with the authorities we have cited. For example:

In Whitney v. N. Y., N. H. & H. R. R. Co. (First Circuit) 102 Fed. 850, 43 C. C. A. 19, 50 L. R. A. 615, in which the employé was held a passenger, it was said:

"He (the employé) stipulated, not only for an increase of wages, but also for free transportation to Boston from the city where he was to be employed, for his own convenience, and not in connection with going to or from his work. He was injured while on one of these trips to Boston and while not going to and from his work, and while he was not employed; that is to say, during the hours when he was free for recreation or to visit his family, or to use his time for any purpose of his own."

Philadelphia & Reading R. Co. v. Derby, 14 How. 468, 14 L. Ed. 502, does not involve the status of an employé while riding gratuitously.

The case of Steamboat New World v. King, 16 How. 469, 14 L. Ed. 1019, involved the case of one accepted as a passenger under a custom to permit those whose usual employment is on board of steamboats to go from place to place free of charge.

In Packet Co. v. McCue, 17 Wall. 508, 21 L. Ed. 705, a man standing on a wharf was hailed by the mate of a boat to assist in loading goods upon it. After completing his work he was paid at the office on the boat. While going ashore he was injured by the negligence of the boat's employés handling the gang plank. Whether the employment ceased after payment for the service was made and before the wharf was reached was held a question of fact for the jury.

In Doyle v. Fitchburg R. Co., 162 Mass. 66, 37 N. E. 770, 25 L. R. A. 157, 44 Am. St. Rep. 335, and Id., 166 Mass. 492, 44 N. E. 611, 33 L. R. A. 844, 55 Am. St. Rep. 417, the injury occurred while the employé was riding upon his own personal business, on a ticket given him as part of his compensation, under which he was at liberty to use the ticket whether going to and from his work or not.

In Dickinson v. West End St. Ry. Co., 177 Mass. 365, 59 N. E. 60, 52 L. R. A. 326, 83 Am. St. Rep. 284, the motorman who was held to be a passenger was traveling free at a time when he was not on actual duty, under a rule permitting such employés to ride at any time or place, and for any purpose, if in uniform.

In O'Donnell v. Alleghany Valley R. Co., 59 Pa. 239, 98 Am. Dec. 336, the carpenter, who was held a passenger while traveling between his home and his place of work, received a less price per day than if he had paid his fare.

In McNulty v. Pennsylvania R. R. Co., 182 Pa. 479, 38 Atl. 524, 38 L. R. A. 376, 61 Am. St. Rep. 721, the case was said to be in its controlling features "on all fours with O'Donnell v. Railroad Company."

The case of Louisville & N. Ry. Co. v. Scott's Adm'r, 56 S. W. 674, 22 Ky. Law Rep. 30, 50 L. R. A. 381, seems to have turned largely upon the proposition that the conductor accepted the deceased as a passenger.

In Abell v. Western Maryland R. Co., 63 Md. 433, 445, the deceased was riding on a pass which, as said by the court, "was no part of the contract between Abell and the railroad. The contract between them was to pay a certain sum for a day's work. It was given as a mere gratuity, and as other passes are given."

In Enos v. R. I. Suburban Co., 28 R. I. 291, 67 Atl. 5, 12 L. R. A. (N. S.) 244, in which a railroad flagman, who received for his services a weekly sum of money plus 14 transportation tickets good on the defendant's road, was held a passenger while riding to his home upon one of the tickets, it is fairly inferable from the opinion, although not expressly stated, that the tickets were good elsewhere than between the place of work and the home, and that they were not limited to use while going to or returning from work. Nor does it affirmatively appear that the wages would be the same were the tickets not given; the court saying:

"The plaintiff earned 14 tickets as well as $8 per week, and the fact that the tickets were purchased by work, instead of cash, is unimportant."

Two cases decided by the Supreme Court of Tennessee are directly in conflict with what we have stated to be the general rule as to the status of an employé while being carried gratuitously to and from his working place. These cases are Transit Co. v. Venable, 105 Tenn. 460, 58 S. W. 861, and New Etna Coal Co. v. Bailey, recently decided and not for publication. In the first of these cases it was held that a railroad employé having nothing to do with the operation of trains but the performing of service at a station, who is permitted by the carrier to travel to and from the place of service on a train without payment of fare, is not a trespasser but a passenger while on its trains. The question whether the relation of master and servant existed was not expressly raised in that case; but the court said that:

"The weight of authority and of sound policy, we think, is that where a servant performs all his work at a fixed place, and the master, either by custom or as a gratuity, carries him to and from his work, the servant doing no service for the master on the train, he is to be treated as a passenger."

We think, however, that the authorities do not sustain this proposition as applied to the case we are considering.

The facts in the New Etna Coal Company Case are substantially the same as those in the case before us; and were we to follow that decision we should be compelled to hold that the deceased was a passenger. The decision in the New Etna Case seems to rest largely upon two propositions: First, that an employé traveling for a purpose wholly disconnected with his employment, and while not engaged in the master's service, upon free transportation furnished him by the master in consideration of his being an employé, occupies, while so traveling, not the position of a servant, but a passenger; and, second, that there is a clear distinction between cases where the servant performs all his duties at a given place and cases where the servant in the necessary performance of his duties, and while in the performance thereof, is transported by the master from place to place, wherever his services may be required. We think that, under the authority we have cited and the facts of this case, the carriage of the deceased cannot be said to have been wholly disconnected from his employment, but that it was, on the other hand, in a very proper sense, connected therewith, contemplated thereby, and incident thereto; and while the case of the servant who is being transported by the master from place to place, wherever his services may be required (such as section hands, employés on work trains, and those having charge of structures or operations along the line of the road), is not identical with that of one who performs all his duties at a given point, yet we think the legal distinction referred to is not recognized by the authorities generally.

In Louisville & Nashville R. Co. v. Stuber, 108 Fed. at page 936, 48 C. C. A. 151 (54 L. R. A. 696), Judge (now Mr. Justice) Lurton, speaking for this court, called attention to the fact that:

"Under the decisions of the Tennessee Supreme Court, the liability of a railroad company to one servant who has sustained injury through the negligence of another has been made to depend upon the subordination of the one to the other, as well as upon refinements in respect to different departments of service."

We, of course, do not know to what extent, if at all, the rule so prevailing in Tennessee may have affected the decisions in the two cases we have just discussed.

There is, in our opinion, nothing in the decisions of this court in Ellsworth v. Metheney, 104 Fed. 119, 44 C. C. A. 484, 51 L. R. A. 389, Winters v. B. & O. R. Co., 177 Fed. 44, 100 C. C. A. 462, Dishon v. Cincinnati, N. O. & T. P. R. Co., 133 Fed. 471, 66 C. C. A. 345, or Huntzicker v. Illinois Central R. Co., 129 Fed. 548, 64 C. C. A. 78, supporting the proposition that the status of the deceased in the case we are considering was that of passenger. On the contrary, there are expressions in Ellsworth v. Metheney and Huntzicker v. Illinois Central R. Co. not in harmony with such conception. For an interesting review of decisions upon the question before us, see the opinion of Judge Cochran in Dishon v. Cincinnati, N. O. & T. P. R. Co. (C. C.) 126 Fed. 194, and the reference thereto in the opinion of this court, 133 Fed. at page 477, 66 C. C. A. 345.

In Louisville & Nashville R. Co. v. Stuber, supra, the plaintiff was foreman of water supply on a division of the defendant's railroad; his business being to supervise the tanks and pumping machinery at the water stations and keep the same in repair, in the performance of which duties he was required to ride over the road from station to station, being furnished with a pass good on all trains. While he was riding on a detached engine to a station where his services were required, he was injured in a collision caused by the negligence of the engineer in charge of such engine. In holding that the plaintiff was not a passenger, Judge Lurton said:

"His transportation to and from his place of work was part of his contract of service, and while being thus transported he was as much in the service of the company as when engaged in the repair or construction of a water tank or pump. He was traveling at the time under a single contract of service, and his right to be carried free to and from his work is inseparable from the contract to do the work, and no valid ground exists for saying that he paid his own fare, or was in any sense a passenger."

The facts in the Stuber Case are thus not identical with those presented here. But, following the proposition just quoted, Judge Lurton said:

"The rule is now well settled that railway employés, while being carried, as part of their contract of service, to and from their place of work, are fellow servants, and not passengers"—citing with approval, among other cases, Gillshannon v. R. R. Corporation, 10 Cush. (Mass.) 228; Seaver v. R. R. Co., 14 Gray (Mass.) 466; Vick v. R. R. Co., 95 N. Y. 267, 47 Am. Rep. 36, and Tunney v. Ry. Co., L. R. 1 C. P. 291.

The cases of Doyle v. Railroad Co., 162 Mass. 66, 37 N. E. 770, 25 L. R. A. 157, 44 Am. St. Rep. 335, Id., 166 Mass. 492, 44 N. E. 611, 33 L. R. A. 844, 55 Am. St. Rep. 417, McNulty v. R. R. Co., 182 Pa. 479, 38 Atl. 524, 38 L. R. A. 376, 61 Am. St. Rep. 721, and State v. Western Maryland R. Co., 63 Md. 433, were there distinguished by Judge Lurton as "cases in which it appeared that at the time of the injury the employé was not in the service of the company, but was traveling for his own purposes, and therefore a passenger." The right to ride on the train in question was, in our opinion, an

implied term of the miners' employment. Such carriage was for the benefit both of the miners and of the company, and was a privilege given for the purpose of facilitating the employment and labor thereunder. The fact that the renting of houses to miners was facilitated by the maintaining of the miners' train does not impress us as important. The houses were presumably maintained, in part, at least, to facilitate the employment of laborers. In fact, deceased did not rent from defendant, and no distinction as respects the carriage was made between those who did and those who did not so rent. Where an employé is, by contract expressed or implied, carried to and from his work in a passenger car of a common carrier, there is more or less room for argument that the contract contemplated his carriage as a passenger; but with the exception of New Etna Coal Co. v. Bailey, we have been cited to no case in which an employé riding gratuitously to and from his work, as an incident of his employment by an employer other than a common carrier, has been held to be a passenger.

[5] We are constrained to hold that the deceased while being transported to his home by virtue of his employment as a miner, and upon this private miners' train, was not a passenger of defendant.

It follows from this conclusion that the case was submitted to the jury upon an erroneous theory, under which recovery was permissible for the negligent acts of coemployés. This error requires a reversal of the judgment.

[6] 3. The court did not err, however, in our opinion, in refusing to direct a verdict for defendant. The first ground of negligence submitted was "the alleged failure of the defendant's superior officers or agents to instruct the brakeman in reference to the use and operation of the derailing switch; that is, the alleged failure to see that the use of that derailing switch was kept up by the train crew." This ground did not involve the negligent conduct of a fellow servant. It was predicated upon the nondelegable duty which a master owes to the servant. It is true that with respect to the operation of its road the defendant's duty to the deceased extended no further, with respect to the complaint under consideration, than to exercise ordinary care to provide a sufficient number of reasonably competent employés, make proper rules for their government, and exercise proper supervision over them; and if that had been done the defendant would not be liable for an injury to an employé in the operation of the road through the negligence of other employés in the operating department, or their failure to observe the rules, notwithstanding such negligence made the place unsafe to work in. Martin v. Atchison, T. & S. F. R. Co., 166 U. S. 399, 17 Sup. Ct. 603, 41 L. Ed. 1051; Pennsylvania Co. v. Fishack (Sixth Circuit) 123 Fed. 465, 59 C. C. A. 269; Kinnear Mfg. Co. v. Carlisle (Sixth Circuit) 152 Fed. 933, 81 C. C. A. 81; Illinois Central R. R. Co. v. Hart (Sixth Circuit) 176 Fed. 245, 251, 100 C. C. A. 49. But the negligence aimed at by the proposition we are considering is the failure of the defendant to properly instruct its operatives, and to exercise proper supervision over them. There was evidence tending to show that due care re-

quired the installation and use of the derailing switch. Its installation was suggested by the defendant's actual experience with a runaway car. The use of this derailing switch had been maintained until a few weeks previous to the accident. There was testimony that its use was discontinued by reason of the failure of defendant to instruct the new head brakeman to use the same. The general superintendent testified that he did not know that the switch was not being operated, and that, had he known, he would have issued such instructions as would have caused it to be used; also, that the accident in question is evidence that the situation required the maintaining of the derailing switch. In view of this testimony, the court would not have been justified in holding, as matter of law, that the fact that the use of such switch was in advance of operations as usually conducted in plants of this character relieved defendant of the charge of negligence. Such proposition was, at best, addressed to the consideration of the jury. Nor would the court have been justified, under the evidence, in holding that the deceased had assumed the risk arising from the nonuse of the derailing switch. He was not engaged in the operation of the road. While the evidence showed that he passed daily in sight of the switch, and while there was evidence from which the jury might have found that he knew the switch was not being regularly used, the testimony was not, in our judgment, such as to require a finding that he knew of the discontinuance of the use of the switch, and that he knew and appreciated the dangers to ensue from such disuse.

[7] 4. The jury were instructed that the measure of care owing by defendant to deceased was what "a prudent, cautious man, experienced in the business of managing and running trains and accustomed to the use of trains under similar circumstances as these, in the exercise of care and skill would have used. * *. *" . The defendant presented a request the effect of which, if given, would have been to exclude from consideration the ground of negligence relating to the alleged failure of instruction and supervision with reference to the derailing switch. The charge as given is in accordance with that approved in Shoemaker v. Kingsbury, 12 Wall. 369, 20 L. Ed. 432, as relating to the duty resting upon a private carrier. The criticism is made that the instruction imposed too high a degree of care upon the employer. We think the criticism is not well made. The deceased was not a mere licensee, as would seem, from the authorities cited, to be defendant's view.

5. Upon the subject of the assumption of risk, the jury was instructed that, if the officers and agents of the company were negligent in the discontinuance of the use of the derailing switch, then the inquiry would be "whether the deceased, Huff, knew of the discontinuance of this switch, and whether a man of ordinary intelligence should have appreciated the dangers that would result from a failure to keep up the use of the derailing switch. If you find from the weight of the proof that the deceased, Huff, knew that the use of the derailing switch was not kept up, and knew, as a man of ordinary intelligence, and appreciated the dangers to be apprehended from the fact, * * *" such fact would be a complete defense to the allegation

of negligence relating to the failure to maintain the use of the derailing switch. To this instruction the criticism is made that it is not necessary that the deceased should have actually appreciated the dangers, provided he, as a reasonable man, should have appreciated them. The instruction which we have quoted may, we think, fairly be construed as conforming to the definition contended for by defendant's counsel.

For the errors above pointed out, the judgment will be reversed, and a new trial ordered.