BERNARD v. MICHIGAN UNITED TRACTION CO.

1. MASTER AND SERVANT—STREET RAILWAYS—PASSENGER — QUESTION FOR JURY.
   Where plaintiff, in an action against an interurban electric railway company for personal injuries received in a collision between two of defendant's cars, was an employee of defendant, and the testimony on the question as to whether, at the time he was injured, he was in the prosecution of his work was in dispute, the trial judge was in error in holding, as a matter of law, that plaintiff was a passenger.

2. SAME—FELLOW-SERVANT.
   *Held*, that if plaintiff was not a passenger he was a fellow-servant of the men operating the cars, and could not recover if his injury was caused by their negligence.

3. SAME—NEGLIGENCE—EVIDENCE—SUFFICIENCY.
   Evidence *held*, insufficient to show that defendant was negligent, either in the manner of giving orders, in making and publishing rules, or in lighting the vestibule of the car.

Error to Jackson; Parkinson (James A.), J. Submitted June 3, 1919. (Docket No. 7.) Reargued April 28, 1920. Decided June 7, 1920.

Case by Charles N. Bernard against the Michigan United Traction Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Sanford W. Ladd* (*Warren, Cady, Ladd & Hill,* of counsel), for appellant.

*Price & Whiting,* for appellee.

FELLOWS, J. This case was originally submitted and assigned at the June term, 1919. It was reargued and reassigned at the April term, 1920. A consider-

On railroad employees or officers as passengers, see notes in 31 L. R. A. 321, 50 L. R. A. 462, 50 L. R. A. (N. S.) 706.

able portion of this opinion is taken from an opinion prepared by the late Justice OSTRANDER after the first hearing.

This case was first before this court upon a plea to the jurisdiction. 188 Mich. 504. It was again here after a trial and was reversed and a new trial granted. 198 Mich. 497. It has been again tried, resulting in a verdict and judgment for the plaintiff, and is again brought here upon the ground, principally, that the trial court charged the jury that as matter of law plaintiff was a passenger upon the defendant's car at the time he was injured; it being the contention of defendant, appellant, that this question was either one for the jury or one which the court should have otherwise answered as matter of law. .

It is first pointed out, in the brief for appellant, that when the case was last before this court it was said in the reply brief for appellant that if it was proved as matter of law that at the time of the accident plaintiff was a passenger on defendant's car the judgment should be affirmed, that it was not affirmed but reversed, and that substantially the same record is presented upon this appeal as was presented on the former appeal. It is argued, therefore, that this court did not find, as matter of law, that the plaintiff was a passenger and that the trial judge in deciding and ruling that he was a passenger declined to follow what was in effect the ruling of this court. It is clear, however, from the record, that the learned trial court did not do that but did find that this court had not expressed any opinion upon the subject and that the question was therefore open upon the last trial. We cannot now state the reason why the suggestion of the appellant made in its reply brief was not noticed in the opinion of this court. That it was not is clear, and that the court did not consider the question whether plaintiff was as matter of law a passenger when

he was injured is quite as clear. It is stated in the opinion that:

"Upon a new trial upon the merits, which this court had ordered, defendant was denied the right to intro-duce any defenses to the action, and the case was submitted to the jury simply for the purpose of computing plaintiff's damages."

It was to this point alone that the opinion was directed, it being held that defendant was entitled to interpose the defenses mentioned in section 1 of the employers' liability act (2 Comp. Laws 1915, § 5423). The point, therefore, that the plaintiff was as matter of law a passenger when he was injured is now for the first time considered in this court.

Plaintiff was an employee of defendant. As alleged in the declaration, he was a general bonding foreman or third rail superintendent, the testimony showing that he was a third rail inspector—inspector of bonding and third rail on the entire system. His home was in Jackson, Michigan. He slept in Jackson. He was paid by the month. How he performed his duties is perhaps well enough illustrated by his testimony about the work on the day he was injured. Stating that he worked when the men did, he was asked what were those hours and answered:

"A. Well, there was no stated time exactly, when they went out. They went according to the way the cars went out, as a rule, to make ten hours. Some places the cars started at six or 5:45 or 6:10, starting time, and I generally made it a point to start and get to that point out of Jackson at seven o'clock. It would all depend on which way I was to go. Seven o'clock in the morning was when I commenced.
"Q. Quitting time?
"A. I quit at 4:30. The men were supposed to be in at 4:30.
"Q. On this day in question, tell us what you had been doing, where you went, and what you were about up to the time you got hurt? I don't care for your

details of what you had been doing during the day. That is unimportant, but where had you been, where were you going, at the time you got hurt, etc.?

"*A*. Well, I left Jackson in the morning at seven o'clock, limited car going west. My point was Kalamazoo and I got into Kalamazoo and I met the gang working at the city of Kalamazoo on one of the main streets—Portage, I think was the name, right near the corner, right in the heart of the city. I gave him a few instructions what to do and how to do this speial work. That morning I was there about an hour, possibly an hour and a half. I got the next car and comes back to Battle Creek for dinner, because I had a gang—I goes to Battle Creek and I got my dinner and go out to see them. They was near the city and I wanted to move them across the city from that branch of the interurban to the branch on the outskirts of the city on the other side, so I takes it up with the city foreman there, the superintendent, the city superintendent, to get a car, an extra car and take these tools and one thing and another across the city, which he did. I went with them. Probably that crossing with them took maybe an hour, or an hour and a half, I don't remember just how long that took. But anyway when we got to the Country Club—that was a point outside of the city, on the west side—we unloaded the tools, and my intentions was then to go along with the car. A local car came along and I got on. My intentions were to get off of that car and inspect what they had done, and in riding across the city in this local car, I made up my mind this car would get to Albion in time enough to meet the third rail gang coming in, although I would have to wait 10 or 15 minutes before they got in. They were coming from the other way, coming from the east. So I got off the car at Albion about 4:20. I think that was the correct time.

"*Q*. 4:20 in the afternoon?

"*A*. 4:20 in the afternoon, at Albion.

"*Q*. Does that mean the Albion shops or Albion?

"*A*. Albion station. I waited there until the third rail crew came in. They came in on that four—I won't be positive about the time; I think it was 4:30 or 4:25, anywheres in that neighborhood. When they came in

I found out what he had been doing and gave him a few instructions what to do the following day. In the meantime I was hungry and I went and I got my supper. After supper, I proceeded across the street to this hotel where I was personally acquainted with the proprietor and I met him and goes into his office and sits down and we visit over old times and one thing and another. When I got ready to leave it was quite late; I think it was between eight and nine o'clock, and that's the last I can remember. I don't remember even getting on the car or how I got on the car, but evidently I got on the car at Albion waiting room."

The car left Albion for Jackson between 9:05 and 9:10 p. m., and the collision occurred about 9:20 p. m. Plaintiff had a ticket calling for rides, furnished him by defendant, and used this ticket when he rode on defendant's cars.

In a sense, the plaintiff was in the defendant's employ when he was injured. There existed between them a contract by which plaintiff was to render to the defendant services from day to day. It is proven that in going from Jackson in the morning to the place or places where men were engaged in the work he was inspecting plaintiff was traveling in the prosecution of his work during hours of work, since he could not otherwise perform his duties at all. He spent sometimes as much time in traveling from place to place in performing his duties as he did in actual inspection of work. The point upon which the case must turn is whether, upon the particular occasion, in riding back to Jackson upon the defendant's car, he was in the prosecution of his work. That depends, in great part at least, upon whether the prosecution of his work ordinarily, and as understood and agreed, required that he ride to Jackson on the occasion in question. He did so, habitually, the occasions being few when he did not sleep in Jackson. His immediate

superior lived and had an office in Jackson. If his time did not belong to the master, and if his contract of service did not contemplate that he should ride on defendant's car as a means of furthering his master's business, he was a passenger.

"One may be both a passenger and an employee of a railroad company; an employee when passing over the road at a time when actually engaged in performing duties for the company, but a passenger while not so engaged, but riding from one place to another, even though continuing all the while in a popular sense in the employment of the company." 5 Am. & Eng. Enc. Law (2d Ed.), p. 516.

See, 4 Labatt, Master and Servant (2d Ed.), § 1555, p. 4669; *Harris* v. *Railroad Co.*, 69 W. Va. 65 (70 S. E. 859, 50 L. R. A. [N. S.] 706, Ann. Cas. 1912D, 59). In the case last cited, it is said:

"The capacity in which he is to be regarded depends upon whether or not his duties to his master required him to ride on the train, or whether or not the relation of master and servant existed at the moment of the injury. If his time at the instant of the injury did not belong to the master, and if his contract of service did not contemplate that he should ride on defendant's cars as a means of furthering his master's business, then he was not a fellow-servant but a passenger.".

"There can be no question but that an employee of a carrier, may, under certain circumstances, be considered a passenger, and entitled to all the rights pertaining to such status, if injured while being transported in the vehicle of the carrier; the capacity in which he is to be regarded *depending upon whether or not his duties to his master required him to ride on the vehicle, and whether or not the relation of master and servant existed at the moment of the injury.*" 4 R. C. L. p. 1010.

To the same effect are *Enos* v. *Railway Co.*, 28 R. I. 291 (67 Atl. 5, 12 L. R. A. [N. S.] 244); *McNulty* v. *Railroad Co.*, 182 Pa. St. 479 (38 Atl. 524, 38 L. R.

A. 376, 61 Am. St. Rep. 721); *Dickinson* v. *Railway
Co.*, 177 Mass. 365 (59 N. E. 60, 52 L. R. A. 326, 83
Am. St. Rep. 284); *Williams* v. *Signal Co.*, 37 S. D.
423 (158 N. W. 901); *Klinck* v. *Railway Co.*, 262 Ill.
280 (104 N. E. 669, 52 L. R. A. [N. S.] 70, Ann. Cas.
1915B, 177). The rule may be stated in another way,
which is that railroad employees while being trans-
ported over the road as an incident of, or in immedi-
ate connection with, their employment or as a part of
their contract of service are not to be regarded as
passengers but as employees merely. *Dayton Coal &
Iron Co.* v. *Dodd*, 188 Fed. 597, 110 C. C. A. 395 (37
L. R. A. [N. S.] 456).

It was the claim of the plaintiff that he was not, on
the occasion of the accident, in the performance of
any service for the master; that he was not required
to return to Jackson after the work of the day was
done for the purpose of making a report to, or to re-
ceive orders from, his superior, that his duties to his
master did not require him to return to Jackson for
any purpose, that he was returning for his own con-
venience and after all duties to the master were at
an end. But this claim was disputed by the defendant.
We do not quote all of plaintiff's testimony, sufficient
only to show what his claim was:

"*Q*. Now, Mr. Ladd asked you about reporting to
Mr. Haak. How often would that occur? What would
be the occasion of your reporting to Mr. Haak?

"*A*. I can't say I reported to him at any time. I
had a line of work to do that didn't require me re-
porting to him.

"*Q*. State whether or not you had any report to
make to him that day.

"*A*. I did not.

"*Q*. I think, in answer to one of his questions, you
stated you reported to him when you came to Jackson.
I want to ask, whether or not you reported to Mr.
Haak every time you came to Jackson?

"*A*. I had nothing to report to Mr. Haak any night.

"*The Court:* That wasn't in the question. The question was whether you did report.

"A. No, I didn't report to Mr. Haak.

"Q. Was there anything about your work that required you to have your room at Jackson or anywhere else?

"A. No, sir.

"Q. State whether or not that was a matter entirely of your own choice.

"A. It was."

Mr. Haak was called by defendant and testified:

"Q. What was his duty in reference to coming back to Jackson and reporting?

"A. His duty was to come to Jackson once a day and make a report."

This was further elaborated upon, but these two quotations demonstrate that the testimony was in dispute as to whether at the time of the accident plaintiff was going to Jackson on his master's business and because the duties of his employment required him to make this trip in order to make his report to his superior, and to get orders from his superior for the next day's work, or, on the other hand, was making the trip for his own convenience. The learned trial judge apparently was much in doubt on the question, and it was only after much insistence on the part of plaintiff's counsel that he held as matter of law that plaintiff was a passenger. Under the testimony as found in this record and under the authorities above cited we conclude that whether plaintiff was a passenger when injured presented a question of fact which it was error not to submit to the jury.

It is a contention of plaintiff that if he was not a passenger, but was in the line of his employment when injured, the defendant cannot shield itself behind the fellow-servant rule; that he was not a fellow-servant with the operatives of the car. It is the claim of plaintiff that there is evidence to sustain the propo-

sition that defendant did not make proper and reasonable regulations for the movement and control of its cars or issue orders and directions for running its cars. It is said by the learned trial judge in a colloquy with counsel that if this court deems a reversal necessary it is hoped it will express itself upon the fellow-servant question so "that we may know in another trial what to do with that question."

Clearly if plaintiff was not a passenger, he was a fellow-servant of the men operating the car in which he rode and those operating the car with which it was in collision. If it was the negligence of any of these fellow-servants which caused the injury, plaintiff cannot recover unless he was a passenger. The injury to plaintiff occurred because the motorman of the car on which he was riding ran his car beyond the point where he was by orders to meet the west-bound car. The motorman testified that he did not see the order for the meeting of cars and that the crew which at Albion turned the car over to him did not read the order to him, as the rules required. The rule is:

"In case conductor and motorman change off before the completion of their trip, they must carefully exchange all orders they may have, and each must know that his orders are perfectly understood by the other. Changes of this kind, however, must never be made without permission of the train dispatcher."

When the car was turned over to the new crew at Albion, the running order for the car in which plaintiff rode was in the vestibule. When the new motorman stepped onto the car, he read a part of the order—the line reading, "Train No. 22, Car No. 35 and Train No. 25, Car No. 65 will meet at Albion." He did not read the remainder, which was, "Train No. 22, Car 35 and Train Ext west, Car No. 207 will meet at No. Concord, instead of Albion." It appears beyond dispute that had the motorman read the second line and

direction of the order, the collision would not have occurred. There was light enough in the vestibule of the car to read the first direction. There was a clearance order, signifying that the car was to proceed without further orders, leaving the order indicated above to stand as the running direction. The motorman says the crew from which he took the car did not read to him the order nor tell him what it contained. This is disputed, there being testimony tending to prove that the motorman who left the car told the new or succeeding one that the order called for meeting of the cars at North Concord. This part of the case is little argued in the brief for appellee. It is perhaps sufficient to say that we find no evidence of negligence of defendant either in the manner of giving orders, in making and publishing rules, or in lighting the vestibule of the car. In short, the evidence appears to be overwhelming to the effect that negligence of a fellow-servant, or of fellow-servants, of plaintiff, if he was not a passenger, caused the collision and so his injury.

The judgment must be reversed and a new trial ordered, with costs to appellant.

Moore, C. J., and Steere, Brooke, Stone, Clark, Bird, and Sharpe, JJ., concurred.